Michelle M. HANSON, Appellant/Cross–
Appellee,

v.

Hans E. HANSON, Appellee/Cross–
Appellant.

Nos. S–11294, S–11313.

Supreme Court of Alaska.

Dec. 9, 2005.

Vanessa White, Anchorage, for Appellant/Cross–Appellee.

Susan D. Mack, Wilkerson, Hozubin & Burke, P.C., and Ryan R. Roley, Anchorage, for Appellee/Cross–Appellant.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

The divorce of Hans and Michelle Hanson required the division and distribution of assets that included an ongoing business, an investment account funded with business profits, proceeds from the sale of a business vehicle, the business's 2001 tax refund, and the couple's residence. The superior court determined that Hans's ninety-five percent share in the business and the investment account were Hans's separate property, that the 2001 tax refund was not a distinct asset but had been taken into account in valuing the business, that the proceeds from the vehicle sale were the property of the business, but that the house was marital property. Michelle challenges the court's failure to classify the business and related items as assets of the marriage; Hans appeals the court's finding that the home was marital property. The superior court also held that Michelle was entitled to payment for her five percent share of the business, but rejected the type of minority discounts proposed by the parties' experts. Hans challenges the court's departure from the experts' recommendations. Finally, the court offset Michelle's interim support and attorney's fees award against her share of the marital estate, and Michelle appeals.

Because the trial court did not commit clear error in finding that the house was marital property, did not err in declining to apply a minority discount to Michelle's share of the business and in declining to make an award to Michelle in respect of the vehicle, and acted within its discretion in offsetting Michelle's pre-trial awards against her final share of the marital estate, we affirm on those issues. But we conclude that the trial court erred in determining that Hans's share in the business was Hans's separate property without applying an active appreciation analysis. We hold instead that the increase in the business's value caused by Hans's marital

efforts was marital property, and remand for specific findings regarding the amount of this appreciation. We also hold that the investment account is marital property because it became marital income once withdrawn from the business, while the tax refund should be classified and distributed in the same manner as the rest of the business.

## II. FACTS AND PROCEEDINGS

### A. Facts

Michelle and Hans Hanson married in November 1998 and separated on May 1, 2002, when Hans filed for divorce. They have no children.

During the marriage Michelle was employed by the Alaska Department of Transportation, while Hans operated a business known as Shaman, LLC ("Shaman"), which offers traffic control services to construction companies. While the parties kept various personal accounts during the marriage, they also shared a joint account. Hans contributed to this account by making regular monthly deposits and through substantial draws from Shaman. Michelle deposited her paychecks, two Permanent Fund Dividend checks, and a $10,000 gift into the joint account.

The key asset at issue in this appeal is Shaman. Hans purchased Shaman in 1993, and the business grew steadily during the marriage. The parties stipulated that Shaman was worth $1,150,000 at the end of 2002, although they dispute the value of each party's shares in the corporation. Hans initially ran Shaman as a sole proprietorship, but he organized it into a limited liability corporation in 1999. The organization papers allocated a ninety-five percent interest to Hans and a five percent interest to Michelle. Hans maintains that he never intended for Michelle's five percent share to transform Shaman from personal to marital property, and that he only gave her a share because his lawyer told him that an LLC needs at least two members.

Various Shaman-related assets are also relevant to this appeal. First, there is a

Hans's Capital Advisors investment account; this account contained $15,000 before the marriage, Hans placed $200,000 from Shaman into the account during the marriage, and it contained $119,000 at the time of trial.[1] Second, the parties dispute the classification of the proceeds from the sale of a Small Unit Support Vehicle (SUSV) that Hans purchased for use by Shaman.[2] In the spring of 2002, before the couple separated, Hans sold the SUSV for $21,000 and withdrew the proceeds from Shaman's bank account. Third, there is a 2001 tax refund of $65,000 for payments made by Shaman. As a Limited Liability Company, Shaman does not directly pay taxes, but instead passes on its liability to Michelle and Hans. The tax refund was issued to Hans and, pursuant to the court's order, he deposited it into the Shaman account pending resolution of whether Michelle was entitled to a share of the refund.

Finally, there is the couple's home, which Hans built before the marriage. Hans initially paid for the construction costs with a loan from his mother, but then took out a $250,000 mortgage to repay the loan; a balance of $35,000 was placed into the couple's joint account. Michelle was never placed on the deed to the house and initial mortgage payments were made from the Shaman account, but payments totaling $40,000 were made from the couple's joint account.

### B. Proceedings

The superior court held that "there is no question that Hans intended to give Michelle [a] 5% interest in Shaman (and not a penny more)." The court rejected Michelle's argument that the five percent was a "pro forma" offering, and that she was actually a member with an equal share in the business, and her argument that her participation in Shaman was significant enough to justify awarding her an equal interest in the business. The court rejected her claims of active participation in the business on the grounds that "the labor she provided was too inconsequential to have contributed to the success of the business," and that "her business advice was neither sought or used by Hans." Thus, it

---

1. The account lost value due to a decline in the stock market.

2. An SUSV is a kind of tracked, all-terrain transport.

held that "neither the doctrines of transmutation or active appreciation justify changing the ownership or invading Hans' separate interest [in Shaman]." Michelle does not appeal the superior court's conclusion that she did not contribute to the business, but she contends that the court erred in holding that this determination governed her active appreciation claim.

Relying on its conclusion that Shaman was separate property, and finding that the SUSV and the 2001 tax refund were Shaman property, the court concluded that the SUSV sale proceeds and the tax refund were not marital property. Instead, the court noted that Michelle's interest in the tax refund was reflected in her five percent share of Shaman.[3] The court also held that the $200,000 Hans deposited into the Capital Advisors account was his separate property because its source, Shaman, was separate property. Michelle appeals all of these findings.

In valuing Michelle's five percent interest in Shaman, the court declined to apply a minority discount. Both parties' experts agreed that Michelle's portion should be discounted for its lack of marketability, which accounts for the lack of liquidity and control associated with a minority interest, although they disagreed about the size of the discount. However, the superior court concluded that such a discount was inappropriate in this case because the minority interest was being acquired by the party that also controlled the rest of the shares. It noted that:

> [In this case] there will not be a sale to a third party. Instead, the Court is being asked to allow Hans to buy out Michelle. If the Court simply requires Hans to pay Michelle $22,000 for her 5% interest, then Hans will achieve a windfall. He will end up with 100% of Shaman. That is not the assumption of the [experts'] models. They assume that the 5% will go to someone else, thus maintaining the conditions that produce lack of control and the lack of marketability and thus necessitated discounting. If Hans is allowed to buy Michelle's 5% interest for the discounted

price of $22,000, then he recaptures not only the discounted value of Michelle's interest, but also the discounted value of his 95% interest. He ends up with a business worth the full $1,150,000, whereas before the sale his 95% interest was worth only $865,000. For $22,000 paid he gets $242,000 of recaptured value.

The court suggested that the parties engage in what Hans's expert referred to as an investment analysis, which would account for the fact that the purchasing party also owned the other shares in the company. However, neither party offered evidence about the investment value of Michelle's interest, and the court declined to apply any discount, pricing Michelle's interest at five percent of Shaman's total value of $1,150,000, or $57,000. Hans appeals this finding.

As to the house, the court held that the parties intended for the house to be marital property, reasoning that "joint use, maintenance and improvement of the residence show that the parties intended that it be a marital asset" and allocated Michelle a sum equal to half its equity. Hans appeals this finding.

Finally, the trial court offset Michelle's share of the marital estate by the full value of her interim support and attorney's fees awards. The court reasoned that it had not been aware of the full extent of Michelle's assets when it made the original award and that evidence at trial demonstrated that she had not been in need of interim aid. Therefore, it credited Hans for his interim support and attorney's fees payments by offsetting them against her portion of the estate. Michelle appeals this finding.

To summarize, Michelle appeals the findings that Shaman, the Capital Advisors account, the SUSV sale proceeds, and the 2001 tax return are Hans's separate property, and she also challenges the trial court's deduction of the interim support and attorney's fees awards from her portion of the marital estate. Hans cross-appeals the trial court's refusal to discount Michelle's five percent

---

**3.** The parties stipulated to an appraisal of Shaman's value which took into account the expect-

ed 2001 tax return.

share of Shaman and its determination that the house was marital property.

## III. STANDARD OF REVIEW

 Equitable division of marital assets is a three-step process: determining what property is available for distribution, assessing the property's value, and allocating the property equitably.[4] We review the trial court's determination of what property is available for distribution for abuse of discretion.[5] Findings of fact are reviewed for clear error, but whether the trial court applied the correct legal rule in exercising its discretion is a question of law that we review *de novo* using our independent judgment.[6] Whether the trial court correctly valued the assets to be divided is a question of fact that we review for clear error.[7]

 The trial court's finding that the parties intended to transmute separate property into marital property is also reviewed for clear error.[8] A finding is not clearly erroneous if it is supported by substantial evidence.[9]

 Finally, awards of both interim spousal support and attorney's fees are left to the sound discretion of the trial court and will be reversed only if we find an abuse of discretion.[10]

## IV. DISCUSSION

### A. Classification of Shaman

Michelle's primary claim is that the superior court erred in failing to apply the active appreciation doctrine. She argues that, under this doctrine, the increase in Shaman's

value that resulted from Hans's efforts during the marriage is marital property.

 We have previously summarized the doctrine of active appreciation in this way:

Active appreciation occurs when marital funds or marital efforts cause a spouse's separate property to increase in value during the marriage.... [T]he time and energy of both spouses during the marriage is to be considered in dividing marital property.... A spouse should not be able to erase his or her contributions of time and energy from the marital estate by rolling them back into a business which he began before the marriage.[11]

 Under this theory, "the asset's value at the inception of the marriage retains its separate character, but any subsequent increase in value is treated as marital property to the extent that it results from active marital conduct."[12] A finding of active appreciation requires application of a three-part test: "First, [the court] must find that the separate property in question appreciated during the marriage. Second, it must find that the parties made marital contributions to the property. Finally, the court must find a causal connection between the marital contributions and at least part of the appreciation."[13] The spouse seeking to classify the appreciation as active has the burden of proving the first two elements—an increase in value and marital contribution [14]—while the burden of showing the absence of a causal link lies with the owning spouse.[15]

 The trial court declined to apply an active appreciation analysis based on its conclusion that "the parties intended an unequal

---

4. *Schmitz v. Schmitz*, 88 P.3d 1116, 1122 (Alaska 2004).

5. *Green v. Green*, 29 P.3d 854, 857 (Alaska 2001) (citing *Cox v. Cox*, 882 P.2d 909, 913 (Alaska 1994)).

6. *Schmitz*, 88 P.3d at 1122.

7. *Id.*

8. *Green*, 29 P.3d at 857.

9. *Inman v. Inman*, 67 P.3d 655, 658 (Alaska 2003).

10. *Beal v. Beal*, 88 P.3d 104, 110–11 (Alaska 2004).

11. *Schmitz*, 88 P.3d at 1125 (internal quotations and citations omitted).

12. *Harrower v. Harrower*, 71 P.3d 854, 858 (Alaska 2003).

13. *Id.* (quoting Brett R. Turner, Equitable Distribution of Property § 5.22, at 236 (2d ed.1994)).

14. *Id.* at 859 (citing Turner, *supra* note 13).

15. *Id.* (citations omitted).

ownership of Shaman." However, even if the parties did intend the 95/5 distribution to be controlling as to their separate ownership interests in Shaman, there is nothing that indicates that they intended to answer the question of how to treat the increase in value of the corporation that occurred during the marriage.[16] To do so, the trial court must apply the active appreciation doctrine. We therefore conclude that the trial court erred in failing to consider active appreciation based solely on its finding that the parties intended to treat Shaman as separate property according to the 95/5 distribution.

Turning to the specific elements of active appreciation, we first look to whether the record shows that Shaman gained value during the course of the marriage. As Hans's expert noted in his report, Shaman saw improvements in key economic indicators during the marriage: in 1998 Shaman posted $663,000 in revenues, $109,000 in net income and had $228,000 in balance sheet equity, while in 2001 Shaman's revenues reached $1,640,000, its income increased to $827,000, and it posted $1,035,000 in equity. These figures suggest that Shaman experienced significant growth during the marital period, but the parties did not present evidence regarding Shaman's value at the beginning of the marriage, preventing calculation of the appreciation in Shaman's value over the course of the marriage. Thus, on remand, the superior court must calculate the size of the marital gains to Shaman by determining Shaman's total value at the beginning of the marriage and deducting this figure from its stipulated value at separation of $1,150,000.[17]

As to the second element of active appreciation, marital contribution, it is undisputed that Shaman was Hans's full-time job and that he worked seventy to ninety hours per week when Shaman had a contract. Hans was adamant that it was his efforts, as opposed to Michelle's, that led to the success of Shaman. In light of this evidence, we conclude that Hans spent significant marital time working on Shaman.

Finally, as to causation, Michelle argues that Shaman grew because of Hans's efforts. Hans, who bears the burden of proving a lack of causation, replies that Shaman's success was driven less by his active efforts during the marriage and more by "passive" factors that either predated the marriage or were out of his control. First, he argues that since many of Shaman's contracts grew out of pre-marital business ties and the business loan used to purchase Shaman was paid off prior to the marriage, the business growth was primarily due to pre-marital efforts. Second, Hans notes that much of Shaman's business stems from government contracts, and asserts that business gains due to fortuitous government action are passive and that his own conduct, which involved submitting bids for subcontracting work, was *de minimis* and insufficiently connected to the gains in Shaman's value. Third, Hans argues that Shaman's success also depended on his employees' contributions, further minimizing the impact of his personal efforts on Shaman's growth.

We conclude, however, that the record contains ample evidence that Hans's efforts were sufficiently related to Shaman's appreciation to satisfy the causation requirement. Although Hans may have created the foundation necessary for Shaman's growth prior to the marriage, it was his later efforts—including the seventy-to ninety-hour work weeks he testified to—that helped effectuate its substantial growth. While the superior court may, on remand, impute part of the growth to Hans's premarital efforts or other factors, it would be unreasonable to conclude that Shaman was able to thrive and expand without any effort or guidance from Hans. In addition, while purely fortuitous changes in government policy can result in passive growth, the treatise Hans relies on for this point cites changes in environmental regulations and currency exchange rates as examples; these sorts of changes would allow appreciation without any significant action by the business owner, and thus are truly pas-

---

16. *Id.* at 858 n. 5 (under active appreciation doctrine efforts of either spouse can lead to gains which are marital property).

17. *See id.* at 859–61 (determination of amount of marital appreciation remanded where record supported "reasonable inference" that item increased in value during course of marriage).

sive.[18] On the other hand, an upswing in government outlays is simply a market expansion, and a business owner must still undertake significant efforts to benefit from such developments.[19] Hans's submission of bids and fulfillment of his contractual obligations were thus necessary prerequisites for Shaman's growth. Finally, although some portion of Shaman's success certainly depended on the efforts of its employees, it is reasonable to infer that their success was due to Hans's knowledge of the business and his ability to hire and manage his staff.[20] Thus, we conclude that Hans's efforts during the marriage played a significant role in Shaman's success. On remand the superior court should determine what portion of the increase in Shaman's value was caused by Hans's efforts during the marriage, distinguishing the effects of these efforts from any appreciation stemming from passive factors.

In sum, we hold that some portion of the value that Shaman gained during the marriage is marital property, and remand for further proceedings regarding: (1) the exact amount of this increase; and (2) the amount of growth due to Hans's efforts and the amount due to other, passive, factors. The portion of Shaman's gains due to Hans's active efforts is marital property.[21] In making these findings, the superior court retains the discretion to take whatever evidence it deems appropriate.[22]

## B. The Capital Advisors Account, the 2001 Tax Return, and the SUSV

Michelle also appeals the superior court's decisions concerning the Capital Advisors account, the 2001 tax refund, and the SUSV.

### Capital Advisors Account

■■■■ Hans withdrew from Shaman the money for the Capital Advisors account thus converting this money into income. This income should fairly be regarded as earned income as it was taken by Hans as a draw rather than as a distribution of LLC earnings (since there is no indication that a like distribution was made on account of Michelle's five percent interest).[23] Spousal income from active efforts during marriage is marital property.[24] Accordingly, we hold that the superior court erred in determining that the Capital Advisors account was Hans's separate property. Thus, on remand the superior court should distribute the account and the sale proceeds as marital property.

### 2001 Tax Return

■■■ As for the 2001 tax return, Michelle offers two arguments: (1) the refund is marital property since the couple reported Shaman's taxes on their joint tax return; and (2) the expert valuation of Shaman did not include the 2001 return as part of Shaman's overall value.

18. TURNER, *supra* note 13, § 5.22 at 255.

19. *See id.* at 248:
> The mere presence of favorable economic conditions, however, does not guarantee a finding that the appreciation is passive.... Where the business was small on the date of marriage and grew dramatically before divorce, or where the owner's individual expertise was a major factor in the success of the business, the appreciation can be at least partly active despite a thriving economy.

20. *See id.* at 252 ("[T]here is considerable value in selection and supervision, and the prudent management of personnel resources often marks the difference between successful and unsuccessful businesses.").

21. This holding applies to both Hans's ninety-five percent share and Michelle's five percent share.

22. If the superior court's reexamination of this issue leads to an increase in the value of the marital estate, the court may revisit the larger question of how best to equitably divide the estate, and may consider whether invasion of separate property is necessary to ensure a fair and equitable distribution. *See Harrower v. Harrower*, 71 P.3d 854, 860 n. 17 (Alaska 2003) (citing *Merrill v. Merrill*, 368 P.2d 546, 547 n. 4 (Alaska 1962)).

23. The parties agree that a fair salary for Hans for his work at Shaman would have been $130,000, whereas he actually drew $4,000 per month or $48,000 annually. He was thus substantially underdrawn in terms of earned income.

24. *Schmitz v. Schmitz*, 88 P.3d 1116, 1124 (Alaska 2004) (salary earned during marriage is marital asset) (citing TURNER, *supra* note 13, § 5.23 at 263).

Both of these arguments fail. (1) Shaman's estimated taxes were paid out of Shaman funds but reported on the parties' joint return in order to reap certain tax benefits to Shaman and the parties. Such commingling of business and personal tax liabilities is not alone sufficient to convert the Shaman tax refund to marital property.[25] (2) The superior court determined that the expert valuation of Shaman took the 2001 tax refund into account, although the 2001 refund check was not received from the IRS until after the expert completed the valuation report. This finding is supported by the expert's report, which states: "[O]ur analysis focused primarily on the 1994–2001 income statement data presented in the tax returns." Therefore, the superior court did not err in finding that the 2001 tax refund is part of Shaman's total value.

Accordingly, valuation and distribution of the 2001 tax refund will depend on the superior court's overall conclusion about Shaman's active appreciation. As the tax refund is part of Shaman's value, it is marital to the same extent and in the same proportions as the rest of Shaman. Thus, on remand when the superior court determines the value and proportion of the marital property in Shaman, it should also apportion the tax refund between the parties according to the same ratio.

*SUSV Sale Proceeds*

■ The evidence suggests that in spring 2002, before the parties separated, Hans deposited the SUSV sale proceeds into a Shaman account and immediately withdrew them. Neither party has offered evidence on the fate of these proceeds after Hans withdrew them from the Shaman account. Thus, in contrast to funds in the Capital Advisors account, the SUSV sale proceeds are indistinguishable from any other draws Hans may have taken from Shaman before separation. Since only property existing as of the date of trial is subject to division unless there is a basis for recapture,[26] and Michelle has not argued that there is a basis for recapture, we decline to disturb the superior court's treatment of the SUSV proceeds.

**C. Classification of the Marital Home**

■ On cross-appeal, Hans argues that the superior court erred in determining that the house was marital property under the doctrine of transmutation. This doctrine recognizes the movement of separate property into the marital sphere, and the central issue in determining transmutation is "the intent of the owner of the separate property, as demonstrated through ... words and actions."[27] Upon a finding of intent, the separate property is transformed into marital property.[28] Factors relevant in determining the parties' intent regarding real property include: "(1) the use of property as the parties' personal residence; (2) the ongoing maintenance and management of the property by both parties; (3) placing title in joint ownership; and (4) using the credit of the non-titled owner to improve the property."[29]

■ In this case, the parties used the house as a residence and there is evidence that Michelle was actively involved in its maintenance and improvement. She testified that she managed the design and construction of a garage and attached loft; selected carpet for installation in the house; landscaped portions of the property; and oversaw the initial construction of a greenhouse and then completed it herself when it was not built to her satisfaction. Also, Michelle

**25.** *See Abood v. Abood,* 119 P.3d 980 (Alaska 2005) ("Commingling separate property with marital property does not automatically lead to a finding of transmutation."); *Carlson v. Carlson,* 722 P.2d 222, 224 (Alaska 1986) ("[T]he act of commingling, in itself, does not automatically establish intent to jointly hold property, and a court always should consider the property's source when determining what assets are available for distribution.").

**26.** *See Abood,* 119 P.3d at 990 (holding that if spouse has dissipated or wasted marital property between separation and trial, recapture may be appropriate); *Ogden v. Ogden,* 39 P.3d 513, 521 (Alaska 2001) (same).

**27.** *Green v. Green,* 29 P.3d 854, 857 (Alaska 2001).

**28.** *Id.* at 858; TURNER, *supra* note 13, § 5.24 at 277–78.

**29.** *Green,* 29 P.3d at 858.

contributed $10,000 towards construction of the garage, the couple made $40,000 in payments on Hans's mortgage and paid for additional construction work with money from their joint account, and Michelle managed the finances and wrote the checks for these payments.[30] These factors all support the superior court's finding that the house transmuted into marital property.

Hans points to countervailing factors, noting that Michelle was not added to the deed and was not liable for the mortgage or the construction contracts. In addition, he testified that he always intended for the house to be his separate property. However, these contrary factors are insufficient in this case. Use of the home as a residence and mutual management and improvement satisfied two of the four criteria that show that the parties intended to treat the property as marital, and thus provided substantial evidence for the trial court's decision even though Michelle was not listed on the deed or liable for the construction contracts. Further, Hans's testimony that he always intended the house to remain separate property is insufficient to reverse the trial court's finding of intent because such testimony is accorded less weight than other, more objective factors.[31] We conclude that the superior court's finding that the parties intended to treat the property as marital was not clearly erroneous.

### D. Valuation of Michelle's Five Percent Interest in Shaman

■ Hans argues that the superior court erred in failing to apply discounts for lack of control and lack of marketability to Michelle's five percent stake in Shaman, and cites to *Hayes v. Hayes*[32] for the proposition that such discounts are required in the context of a divorce. In *Hayes* the trial court rejected a minority discount, and instead valued the business based on the size of the life insurance policies taken out by the parties to allow the surviving spouse to purchase the interest of the deceased stockholder.[33] We reversed, finding the evidentiary basis for this valuation inadequate.[34] In addition, in *Hayes* we explicitly rejected the contention that minority discounts are inappropriate in divorce cases, noting that "[t]he concept of value is keyed to the price that a prospective buyer would pay."[35] Hans relies on this language, arguing that the superior court was required to calculate the fair market value of Michelle's share by applying a minority discount.

However, as Michelle points out, *Hayes* merely affirms that minority discounts *can* be used in proper settings, not that they *must* be applied in all instances. Indeed, there is authority for the trial court's position that where the party buying the shares would gain control of the business, minority discounts ought not be applied. As Turner notes in his treatise on equitable distribution, "[i]n determining whether to apply a minority discount or control bonus, the court should look at the amount of stock owned by the parties together, not the amount of stock titled in the name of each spouse separate-

---

**30.** Hans argues that this last factor is not persuasive, explaining that Michelle demanded that she, and not Hans's bookkeeper, make the payments. However, he testified that even if the bookkeeper had made the payments, the funds would still have come from the marital account. Thus, the inference of joint payment and use remains unchanged; although this particular arrangement may have been adopted at Michelle's urging, Hans's acquiescence to this system supports a finding of intent to treat the property as marital.

**31.** *See Leis v. Hustad,* 22 P.3d 885, 888 (Alaska 2001) ("[S]elf-serving testimony at trial is entitled to little weight because the parties' actions during the marriage are better indicators of the parties' intent during the marriage.") (citations omitted); TURNER, *supra* note 13, § 5.24 at 278–79 (testimony from owning spouse that he in-

tended to gift property to marital estate more credible than testimony that no gift was intended). Indeed, if Hans truly intended to keep the property separate, a prenuptial agreement or a clear, written statement of intent would have provided better evidence of the parties' wishes. *See Compton v. Compton,* 902 P.2d 805, 809 (Alaska 1995) (prenuptial agreement provides probative evidence of parties' intent to keep premarital property separate).

**32.** 756 P.2d 298 (Alaska 1988).

**33.** *Id.* at 299.

**34.** *Id.*

**35.** *Id.* at 300 (citing *Moffitt v. Moffitt,* 749 P.2d 343, 347 (Alaska 1988)).

ly."[36] The rationale for such a rule is reflected in the concerns of the superior court: Rote application of minority discounts in such situations undervalues minority shares because the key assumption underlying minority discounts—that the hypothetical buyer will also be a minority shareholder and would thus demand a discount—simply does not apply.[37]

Hans's expert noted that a separate kind of analysis known as an "investment analysis" would account for the value of Michelle's share in light of the fact that the buyer owned the rest of the corporation, and the court invited the parties to undertake this analysis while making it clear that the already-presented minority discounts were inapplicable in this case. However, the parties chose not to submit an investment analysis.

Because we agree that a minority discount was not appropriate given that Hans would own all of the shares of Shaman after the sale and given that the parties did not offer evidence about a discount that could account for the facts of this case, we affirm the superior court's decision to value Michelle's share as five percent of the total value of Shaman.[38]

### E. Offset of Michelle's Interim Support and Attorney's Fees Awards Against Her Portion of the Marital Estate

 Under AS 25.24.140(a), during the pendency of a divorce proceeding, the trial court, in "appropriate circumstances," may award a spouse "attorney's fees and costs that reasonably approximate the actual fees and costs required to prosecute or defend the action" and "reasonable spousal maintenance." The primary factors to be considered when awarding interim spousal support and attorney's fees are the parties' relative economic circumstances, earning capacities, and ability to pay.[39] Support awards and attorney's fees help to ensure that neither party is disadvantaged in presenting their claims,[40] but where the parties' economic situations and earning capacities are comparable, each party should bear his or her own costs.[41]

 Michelle argues that the superior court erred in offsetting her interim support and pre-trial attorney's fees award against her share of marital property. Michelle maintains that allowing offset of pre-trial awards unfairly burdens the more vulnerable spouse since spousal support is only awarded to financially disadvantaged parties. However, her argument assumes that the spouse against whom an offset is granted is actually disadvantaged. Where it becomes evident that the spouse granted interim fees was, in fact, able to bear these costs, then an offset for these payments is an appropriate exercise of the trial court's broad discretion in matters involving interim support and attorney's fees.

**36.** Turner, *supra* note 13, § 7.08, at 545 (citing *Eyler v. Eyler*, 492 N.E.2d 1071 (Ind.1986) (error to apply minority discount to wife's portion of shares where couple's shares totaled ninety percent of corporate stock)). Hans also cites to *Money v. Money*, 852 P.2d 1158 (Alaska 1993), but that case is distinguishable. In *Money* neither party disputed whether a minority discount should be applied, and instead argued about the proper discount rate. *Id.* at 1162. Nowhere in *Money* did we require application of minority discounts in all instances. Instead, we simply acknowledged that such discounts could be utilized and resolved a dispute about the size of a particular discount.

**37.** In *Hayes* the husband and wife did not own all of the shares of the relevant property; their shares equaled only fifty percent of the total shares, thus arguably justifying a minority discount because ownership of the shares did not provide control. 756 P.2d at 299.

**38.** As a consequence of our conclusion in Part IV.A., *supra*, when valuing Michelle's five percent separate property share, the superior court should not include within her share that portion of the business that appreciated during the years of marriage; gains from marital active appreciation are properly categorized as marital property.

**39.** *Schmitz v. Schmitz*, 88 P.3d 1116, 1130 (Alaska 2004) (discussing requirements for interim attorney's fees awards); *Johnson v. Johnson*, 836 P.2d 930, 934 (Alaska 1992) (discussing requirements for interim support orders).

**40.** *Johnson*, 836 P.2d at 934.

**41.** *Schmitz*, 88 P.3d at 1130.

Michelle cites *Lewis v. Lewis*[42] for the proposition that spousal support is distinct from the distribution of marital property, and notes that in *Lewis* we reversed the trial court's offset of interim support and attorney's fees. Michelle suggests that *Lewis* supports reversal because the superior court improperly treated interim support as a "species of marital property." However, in this case the superior court did not consider the interim support award as marital property. Instead, it concluded that interim support was unjustified because Michelle had not been actually disadvantaged. Thus, the proper question is whether the court made factual findings sufficient to uphold its conclusion.

In this case, the court made various factual findings. Specifically, it observed that Michelle had long been employed and retained significant earning capacity, that she had substantial assets, and that both parties had sufficient economic means to prosecute their claims. In contrast, Michelle makes no mention of assets anywhere in her discussion of this issue. Further, as Hans notes, there was evidence before the court that she had substantial assets that allowed her to purchase and furnish a home three months after receiving notice of her divorce and to take numerous trips while ostensibly in need of spousal support. Thus, in light of the court's specific findings and the other evidence in the record, we conclude that the superior court did not abuse its discretion in offsetting Michelle's interim support award against her share of the marital estate.

Michelle also argues that allowing offsets amounts to unfair surprise. She asserts that because parties take their interim awards into consideration when budgeting, the court "misl[eads] the recipient into overspending her income." However, in its original interim support order, the superior court noted that both parties had significant assets and cautioned that "[i]t is very likely that each party will ultimately bear their respective attorney's fees and costs." And, at a subsequent pre-trial hearing Michelle's counsel prevented cancellation of the interim support by reminding the court of its earlier warning:

[I]f at trial the court were to determine that the spousal support was inappropriate or something like that, there's certainly money there for Mr. Hanson to recover his interest. The spousal support can always be dealt with at trial retroactively, which is what Your Honor ruled back when the initial motion was filed in July.

In response, the trial court allowed the spousal support to continue, but again warned that "[Michelle] needs to simply understand that there's some possibility that once I see the entire picture I decide I should never have given [interim support] to her or should be held against her somehow...." The trial court thus gave her full notice that her award could be offset against a later judgment and she cannot now claim that she was unprepared to deal with the superior court's offset.

## V. CONCLUSION

Because the superior court erred in failing to consider the active appreciation doctrine in valuing Shaman, we REVERSE the court's decision that Shaman was separate property and REMAND for calculation and distribution of the marital gains in Shaman. In addition, we also REVERSE the superior court's conclusion that the Capital Advisors account was Hans's separate property. We instead conclude that the Capital Advisors account is marital property because it was funded from marital income, and that the marital classification of the tax refund should mirror the marital classification of Shaman.

Because the superior court did not err in finding that the marital home had been transmuted into marital property, we AFFIRM that determination. We also AFFIRM the superior court's decision not to apply a minority discount to Michelle's share in Shaman and not to make an award in respect to the SUSV sale proceeds. Finally, because the superior court did not abuse its discretion in offsetting Michelle's interim support award and attorney's fees against

---

42. 785 P.2d 550 (Alaska 1990).

her share of the marital estate, we AFFIRM that decision.