Kelly CARR, Appellant,

v.

Connie CARR, Appellee.

No. S–11598.

Supreme Court of Alaska.

Feb. 9, 2007.

Ann DeArmond, Sterling & DeArmond, P.C., Wasilla, for Appellant.

Candice M. Bales, Law Office of Candice M. Bales, Palmer, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

BRYNER, Chief Justice.

## I. INTRODUCTION

Soon after Kelly and Connie Carr separated in 2004, Kelly was indicted for sexually abusing minors and possessing child pornography. Connie then filed for divorce. With Kelly's consent, Superior Court Judge Eric Smith presided over both the divorce and the criminal cases. After a jury convicted Kelly in the criminal case, Judge Smith held a trial on disputed property issues in the divorce; Kelly participated telephonically from the jail. The court ruled against Kelly on most points in dispute. Kelly later moved to set aside the property order, alleging that by the time Judge Smith decided the property issues, he had formed a bias against Kelly because of evidence presented during the criminal trial. Judge Smith refused to recuse himself and denied Kelly's motion. On appeal Kelly claims that the superior court erred in deciding disputed property issues and in requiring Kelly to participate telephonically at trial. He also renews his assertions of bias, contending that Judge Smith should have stepped down from the case and granted a new trial. Our review of the record reveals no clear error or abuse of discretion in the court's rulings on property issues and on Kelly's presence at trial; we also find no support in the record for Kelly's claims of actual and apparent judicial bias. We therefore affirm.

## II. FACTS AND PROCEEDINGS

Kelly and Connie Carr married in 1985. They have two children, a son and a daughter. In 1994 the family hit a moose while driving in their car; the accident caused relatively minor injuries to Connie and the children but left Kelly with a spinal injury that rendered him a quadriplegic. The family sued the manufacturer of their car, Subaru, and recovered a net $250,000 in August 2000. The settlement funds were distributed with four separate checks: each child received a check for $1,000; Connie was paid ten percent of the total funds; and the remaining eighty-nine percent went to Kelly.

It is undisputed that the funds Kelly recovered compensated him for noneconomic losses and, as a result, became Kelly's separate property when he received the payment. Kelly temporarily deposited the settlement proceeds into three accounts: the parties' joint checking account, a savings account, and a money market account. Soon after, Kelly transferred the money into his stock account.

Meanwhile, in 1996, Kelly and Connie had purchased a lot in Palmer from a contractor who agreed to build them a new home on the property; the cost of the contract totaled $119,452. Kelly and Connie financed the transaction with a mortgage through the USDA Rural Development Service.

Soon after the new house was built, its basement began flooding. Kelly and Connie sued their contractor and eventually recovered $43,095. They received the money for this settlement in October 2000—about three months after receiving the Subaru settlement funds—and deposited it into their joint checking account.

While their suit against the contractor was pending, Kelly and Connie obtained an additional loan from USDA Rural Development in the amount of $20,000.[1] The same day the parties received the settlement funds for their contract claim, Kelly combined funds from the Subaru settlement and the contract settlement to pay off the outstanding balances on the parties' two outstanding USDA Rural Development loans. These payments totaled $136,990—$93,895 of which came from Kelly's savings and stock accounts.

Kelly and Connie separated less than a year later, in September 2001. On November 26, 2001, the state filed multiple charges against Kelly for possessing child pornogra-

---

1. During this period, Kelly and Connie also obtained a loan of $30,000; but this loan was eventually forgiven and has no bearing on this appeal.

phy and sexually abusing minors, including his daughter and a niece.

In February 2002 Connie filed for divorce. With Kelly's approval, both the criminal case and the divorce case were assigned to Superior Court Judge Eric Smith. Judge Smith stayed the divorce proceedings pending Kelly's trial in the criminal case. Kelly was released on bail and allowed to remain in the marital home until his criminal trial. A jury found Kelly guilty on the criminal charges in March 2004. He was remanded to custody after being found guilty.

The divorce proceedings resumed soon after the criminal case was tried. Judge Smith held a hearing to resolve disputed custody and property issues on June 2 and 4, 2004. Before the hearing, Kelly moved for an order requiring the Department of Corrections to transport him to court for the divorce proceedings; he asked that the department bear the costs of his transportation, asserting that he was indigent. The department opposed Kelly's motion, contending that Kelly had failed to show that he was indigent or that he needed to be personally present to participate in the proceedings. The court denied Kelly's motion, noting that he could appear telephonically.

The main controversy at trial centered on dividing the parties' assets and determining who owned the marital home. Connie argued that the court should divide the marital property equally and contended that the home was marital property. Kelly chiefly maintained that the court should treat eighty-nine percent of the value of the house as his separate property. In taking this position, he asserted that the home had been paid for with the Subaru settlement monies, eighty-nine percent of which had been his separate property. Kelly also asked the court to award him monthly alimony payments of $400 so that he could obtain a college degree. He further sought an award of attorney's fees.

The superior court issued findings of fact and conclusions of law resolving the property issues on June 17, 2004. Its decision treated the parties' home as a marital asset, divided the marital estate evenly, and denied Kelly's requests for spousal support and attorney's

fees. To implement the property division, the court directed Connie to pay Kelly $67,370 within ninety days after the court issued its order.

On June 25, 2004—eight days after issuing his findings and conclusion in the divorce case—Judge Smith presided over the sentencing hearing in Kelly's criminal case. During the hearing, Judge Smith described his reaction to some of the images of child pornography presented during the trial, saying:

> They made me want to scream, to put it bluntly. It was all I could do to restrain myself. It's one of the most difficult moments I've had on the bench since I became a judge. It's almost been eight years. But I just wanted to run out of the room screaming. They were awful.

Nearly nine months later, in March 2005, Kelly filed a motion in the divorce case, seeking to set aside the property division under Civil Rule 60(b) on grounds of newly discovered evidence. Kelly's newly discovered evidence consisted of Judge Smith's remarks at Kelly's sentencing hearing, which, according to Kelly, demonstrated that the judge was biased against him and should not have presided over the divorce proceedings. Kelly also moved to disqualify Judge Smith from ruling on the Rule 60(b) motion.

Judge Smith denied Kelly's request to recuse himself. Superior Court Judge Dan A. Hensley affirmed this decision, ruling that Kelly had failed to establish that Judge Smith was biased. Judge Smith then proceeded to consider Kelly's motion for relief from judgment, denying the motion both on its merits and because it was untimely.

Kelly now appeals the superior court's order distributing the marital property, its denial of his motion to appear personally at the divorce trial, as well as its subsequent order denying his motion for relief from judgment.

## III. DISCUSSION

### A. Classifying the Marital Home

■ Kelly insists that the superior court erred in classifying the parties' residence as marital property. He argues, as he did be-

low, that the loans on the residence were paid off with money from his savings and stock accounts, eighty-nine percent of which can be traced back to his personal injury settlement, which was his separate property. Accordingly, Kelly reasons, eighty-nine percent of the home's equity should have been treated as his separate property. Kelly insists that he never intended to donate any portion of his Subaru settlement funds to the marital estate, and he claims that he used his settlement monies to pay off the mortgages only because he believed it would be a sound investment to "park his money" in the house instead of investing it in the stock market.

Connie responds that "[t]he house was acquired as a marital asset and always remained a marital asset." She insists that, even if Kelly did not intend to donate his Subaru settlement funds to the marriage when he originally received them, the funds "transmuted [in]to a marital asset when they were used to pay off the house."

In ruling on this point, the superior court agreed with Connie's position, expressly rejecting Kelly's theory: "The house clearly was marital at the time it was purchased. [Kelly's] argument therefore really is that by paying off the mortgage, the house transmuted largely into his personal property." In addition to noting that it had found no case law to support Kelly's theory of "reverse" transmutation, the court found that Kelly's actions during the marriage demonstrated that he intended to use the Subaru settlement funds as marital assets:

> While [Kelly] denied it at trial, the monies used to pay off the loans were contributed to the marriage. The parties were in severe financial straits; the payments resolved many of their financial difficulties. [Kelly] routinely used his personal funds to pay marital expenses, and in this case he used the settlement funds to pay off credit

cards. Most important, the house remained titled in both parties' names when they received their new title to the house, and they continued to reside there and to treat the home as their marital residence.

▇▇▇ Although Kelly adamantly disputes these findings, it is not our role as an appellate court to reweigh the evidence or redetermine disputed factual issues. Whether a spouse's separate property has become marital property through transmutation is an issue of intent.[2] The superior court determines whether this intent exists by examining the parties' words and actions.[3] Whether intent to transmute separate property into marital property exists is an issue of fact.[4] Trial courts exercise broad discretion when dividing marital assets.[5] We review a trial court's decision to classify property as marital only for abuse of discretion;[6] and we review the court's underlying factual findings only for clear error.[7] Here, substantial evidence supports the superior court's findings. Those findings are not clearly erroneous, and our review of the record does not persuade us that the superior court abused its discretion in treating the home as a marital asset.

### B. Imputed Rent

▇ The superior court may impute the rental value of one party's exclusive use of the marital residence after separation to that party when it equitably divides the marital estate between the parties.[8] After Kelly and Connie separated, Kelly lived in the family residence for about twenty-nine months; during most of that time he was awaiting trial on his criminal charges. In dividing the marital property, the superior court treated this period of occupancy as though Kelly had received twenty-nine months' worth of rent from the marital estate. Kelly contends that the trial court should have imputed only eleven percent of the rent to him. But his

2. *Odom v. Odom*, 141 P.3d 324, 332 (Alaska 2006).

3. *Id.*

4. *Green v. Green*, 29 P.3d 854, 857 (Alaska 2001).

5. *Cox v. Cox*, 882 P.2d 909, 913 (Alaska 1994).

6. *Veselsky v. Veselsky*, 113 P.3d 629, 632 (Alaska 2005).

7. *Hanson v. Hanson*, 125 P.3d 299, 304 (Alaska 2005).

8. *Korn v. Korn*, 46 P.3d 1021, 1023–24 (Alaska 2002).

position hinges on his mistaken premise that eighty-nine percent of the home's equity was his separate property. Because we have rejected that premise, Kelly's challenge to the order imputing rent lacks merit.

## C. Equal Division of the Marital Estate

 Kelly next argues that the court should not have divided the marital estate evenly. We review a trial court's allocation of property for abuse of discretion and will not reverse the court's order "unless it is clearly unjust." [9]

Here, in determining how to divide the marital estate, the superior court simply noted: "The parties agree that the estate should be split 50/50." Kelly disputes this finding. Although he seems to acknowledge that he never explicitly argued for an uneven division, he insists that he implicitly sought an unequal division by arguing that he owned eighty-nine percent of the equity in the family home: "[I]t was clear that if the court held that the real property was marital [Kelly's] position was that an equitable division required that he receive a greater share of the marital property."

Connie disagrees. She notes that nowhere in his trial brief or his testimony at trial did Kelly assert that he should receive more than fifty percent of the marital estate. Connie's observation has merit. Our review of the record reveals no backup contention by Kelly—implicit or explicit—that the court should divide the marital estate unevenly if it rejected his argument that eighty-nine percent of the home's equity was his separate property.

Kelly nonetheless argues that he rebutted the presumption favoring an equal division [10] by presenting evidence showing that, unlike Connie, he had grave health problems, lacked earning capacity, had extremely poor financial prospects, and had never obtained a college degree. Kelly insists that under these circumstances the statutory factors governing equitable division [11] required the court to award him the lion's share of the marital estate. In response Connie points to the reality that Kelly has now been sentenced to serve a lengthy term in prison, so most of his material needs will be provided by the state. Further, she argues, Kelly's financial situation at the time of the trial was actually better than hers, and any financial woes Kelly now faces have largely been caused by his own criminal conduct.

Our review of the record convinces us that Connie has the better argument on this point. As the superior court aptly noted, "here both parties lived on low incomes which barely met their expenses." Although Connie's new nursing degree gives her an advantage in meeting her future needs, Kelly's lengthy prison sentence means that the Department of Corrections will be responsible for meeting his physical and rehabilitative needs in the foreseeable future. Since we find no compelling evidence in the record that would dictate an uneven property distribution under these circumstances, we see no basis for concluding that the superior court abused its discretion in evenly dividing the marital estate.

## D. Rehabilitative Maintenance

 While testifying at trial, Kelly asked the court to award him rehabilitative spousal support so that he could obtain a college degree. He testified that he wanted to study architecture or design, thought it would take him about three years to obtain a degree, and estimated that he would need around $400 per month in support. In rejecting this request at the conclusion of trial, the superior court, relying on Connie's opposing position, noted that Kelly "was not precluded from going to college during the marriage, and in fact he specifically chose not to do so." Kelly challenges this ruling, arguing that, given his physical disability and lack of marketable skills, an award of spousal support was warranted.

---

**9.** *Harrelson v. Harrelson,* 932 P.2d 247, 250 (Alaska 1997) (quoting *Cox,* 882 P.2d at 913).

**10.** *See Lowdermilk v. Lowdermilk,* 825 P.2d 874 (Alaska 1992).

**11.** *See* AS 25.24.160(a)(4).

We review decisions concerning spousal maintenance for abuse of discretion.[12] Our case law recognizes spousal maintenance is usually appropriate only when it is both "just and necessary" since "[t]he preference in Alaska is to resolve the financial concerns arising from a divorce by means of the property division."[13] Moreover, we have previously observed that the form of spousal support Kelly requested here—rehabilitative alimony—should usually be reserved for situations in which "the recipient spouse intends to apply the alimony toward job training designed to lead to employment."[14] We have also noted that "the primary factors which should be considered in awarding interim spousal maintenance are the relative economic circumstances and needs of the parties and the ability to pay the maintenance."[15] We have emphasized that, to qualify for rehabilitative alimony, a spouse must at least identify "a career goal, a degree program aimed at realizing that goal, and a time frame during which the degree may be earned through reasonable diligence."[16]

Judged by these standards, Kelly's request for alimony seems marginal, at best. Kelly claimed only that he "was hoping to get a degree." He had not yet identified any particular school or program; he roughly estimated that "in order to get that degree, basically I'd need at least three more years of college"; and he made no concrete showing to justify the amount of support that he requested:

Court: So how much did you say you wanted, sir?

Kelly: I'd agree with what [my lawyer] said. I can't really remember what she said. She said something for three years.

Counsel: It was $400.00.

In short, Kelly's proposal hardly identified a specific degree program aimed at realizing a well-defined career goal within an established time frame. And, as a practical matter, the proposal might not have appeared reasonably calculated to enhance Kelly's earning potential. Rehabilitative maintenance is a needs-based, pragmatic remedy designed to be used when justified by disparity in a divorcing couple's circumstances.[17] Yet as we have already mentioned, Kelly's conviction means that he will have most of his financial and rehabilitative needs addressed by the Department of Corrections for the foreseeable future. Although the superior court was understandably reluctant to consider this factor because Kelly's sentencing hearing remained pending when the court issued its decision on the property division, we see no reason to ignore the reality of Kelly's situation now that he has been sentenced. By contrast to Kelly, Connie now shoulders primary responsibility for the parties' children, and she faces significant financial pressures. As the superior court accurately observed, at the time of trial "both parties lived on low incomes which barely met their expenses."

Considering the totality of these circumstances, we hold that the superior court did not abuse its discretion in denying Kelly's request for rehabilitative alimony.

### E. Attorney's Fees

Kelly also challenges the trial court's decision denying his request for attorney's fees. He points out that he had no appreciable income during the trial, whereas Connie did. Given this disparity, Kelly contends, the trial court should have leveled the playing field by ordering Connie to pay his attorney's fees.

**12.** *Silvan v. Alcina,* 105 P.3d 117, 125 (Alaska 2005).

**13.** *Fernau v. Rowdon,* 42 P.3d 1047, 1058 (Alaska 2002).

**14.** *Jones v. Jones,* 835 P.2d 1173, 1178–79 (Alaska 1992).

**15.** *Johnson v. Johnson,* 836 P.2d 930, 934 (Alaska 1992).

**16.** *Virgin v. Virgin,* 990 P.2d 1040, 1043 (Alaska 1999) (quoting *Myers v. Myers,* 927 P.2d 326, 328 (Alaska 1996)).

**17.** *See* AS 25.24.160(a)(2) (instructing a court to consider, among other things, "the financial condition of the parties").

■ We have held that a trial court has broad discretion in awarding attorney's fees in divorce cases.[18] In exercising this discretion, the court must focus on the parties' relative economic situations and earning capacities.[19] We will not reverse a trial court's ruling on attorney's fees unless it is "arbitrary, capricious, or manifestly unreasonable."[20]

■ Here, in denying Kelly's motion for attorney's fees, the superior court properly noted that "the parties' economic circumstances during this case are the relevant ones—not what plaintiff might make in the future." The court went on to observe that, at the time of trial, both parties had low incomes that barely covered their expenses. Because the record supports the superior court's view of the case and fails to establish any glaring financial disparity, we hold that the court did not abuse its discretion in denying Kelly's request for fees.[21]

### F. Kelly's Request To Appear Personally at Trial

■ Kelly maintains that the superior court abused its discretion by denying his pretrial request to allow him to participate in the divorce trial in person. He insists that the Department of Corrections could have transported him from the jail to the courthouse at minimal expense and without delaying the proceedings. By requiring him to participate in the trial telephonically, Kelly insists, the court robbed itself of the opportunity to fairly assess his truthfulness while he testified. Kelly further suggests that his absence from the courtroom handicapped his attorney by foreclosing "all possibility of contemporaneous consultation" at trial. Under these circumstances, Kelly claims, "[p]rejudice should be presumed."

Initially, we note that the record fails to support Kelly's claim that the court deprived him of the right to consult with his counsel.

To the contrary, the record reveals that the superior court allowed Kelly's lawyer to speak privately with Kelly both times counsel requested to do so during the course of the trial.

Furthermore, the record fails to convince us that Kelly met his burden of showing that his personal presence at trial was necessary to allow the court to evaluate issues of credibility. Kelly's burden on this point is established by AS 33.30.081(f), which prohibits courts from ordering a prisoner to be transported to court for civil proceedings unless the prisoner establishes an actual and pressing need:

> A court may order a prisoner who is a party or witness to a civil action or a witness to a criminal action to appear at a place other than within a correctional facility only if the court determines, after providing a reasonable opportunity for the commissioner to comment, that the prisoner's personal appearance is *essential to the just disposition of the action.* In making its determination, the court shall consider available alternatives to the prisoner's personal appearance including deposition and telephone testimony.[22]

We have previously identified several factors to guide a trial court in determining whether a prisoner's personal appearance is "essential to the just disposition" in a civil action:

> In making its determination the trial court may take into account [1] the costs and inconvenience of transporting a prisoner from his place of incarceration to the courtroom, [2] any potential danger or security risk which the presence of a particular inmate would pose to the court, [3] the substantiality of the matter at issue, [4] the need for an early determination of the matter, [5] the possibility of delaying trial until the prisoner is released, [6] the prob-

**18.** *Sloane v. Sloane,* 18 P.3d 60, 64 (Alaska 2001).

**19.** *Dodson v. Dodson,* 955 P.2d 902, 914 (Alaska 1998).

**20.** *Schmitz v. Schmitz,* 88 P.3d 1116, 1122 (Alaska 2004).

**21.** *Cooke v. Cooke,* 625 P.2d 291, 293 (Alaska 1981) (reversing an award of attorney's fees under comparable circumstances).

**22.** AS 33.30.081(f) (emphasis added).

ability of success on the merits, [7] the integrity of the correctional system, and [8] the interests of the inmate in presenting his testimony in person rather than by deposition.[23]

 We review a trial court's decisions regarding a party's telephonic appearance for abuse of discretion.[24] Under circumstances similar to those at issue here, we have previously found that a trial court was "well within" its discretion in denying a prisoner's motion to appear personally in a civil trial:

> While expressing his desire to be present at trial and intention to testify, [the appellant] did not demonstrate to the court what specific information he intended to convey through his testimony that would depend on his credibility, nor did he present the court with any basis on which to believe that the outcome of the case would depend upon his presence. Without a specific offer of credibility-dependent evidence or a demonstration in his motion of any material issues he intended to dispute, the court was well within its authority to deny [the appellant's] motion for transport.[25]

In this case, Kelly's pretrial motion to appear personally at trial advanced no specific offer of credibility-dependent evidence; it merely noted that Kelly's credibility would be relevant to the court's decisions in classifying and valuing the marital property. As Judge Smith observed in rejecting this generalized contention during the trial, Kelly's testimony during the recent criminal trial had given the judge ample opportunity to observe Kelly's demeanor and Kelly offered no reason to expect that his personal pres-

ence during the divorce trial would add anything new.

Moreover, the main points in contention at trial—Kelly's separate ownership of the marital home and his request for rehabilitative alimony—turned largely on evidence concerning past conduct of the parties that might have manifested their intentions concerning the status of their marital home and evidence concerning their current financial status. Because self-serving testimony describing a party's prior intent regarding a disputed item of property seldom deserves much weight,[26] Kelly's personal presence to give this sort of testimony would not have been crucial. Accordingly, the court did not abuse its discretion in concluding that Kelly's personal presence was not "essential to the just disposition of the action." [27]

## G. Bias and Recusal

 In his last argument, Kelly contends that Judge Smith was biased. Specifically, he argues that the judge should have recused himself from the divorce case and granted a new trial because of his strong adverse reaction to pornographic photographs introduced during Kelly's criminal trial—a reaction Judge Smith failed to disclose until Kelly's sentencing hearing, which occurred eight days after the judge had decided the property issues in Kelly's divorce.

 We review a judge's decision on an issue of recusal for abuse of discretion;[28] we will reverse a judge's refusal to step down from a case only when it appears "patently unreasonable" [29] or when "a fair-minded person could not rationally come to [the same] conclusion on the basis of known facts." [30]

**23.** *Richard B. v. State, Dep't of Health & Social Servs., Div. of Family & Youth Servs.,* 71 P.3d 811, 827 (Alaska 2003) (quoting *B.H. v. W.S. (In re F.H.),* 283 N.W.2d 202, 209 (N.D.1979)).

**24.** *Richard B.,* 71 P.3d at 817.

**25.** *Id.* at 828.

**26.** *See, e.g., Hanson v. Hanson,* 125 P.3d 299, 308 (Alaska 2005) ("Hans's testimony that he always intended the house to remain separate property is insufficient to reverse the trial court's finding of intent because such testimony is accorded less weight than other, more objective factors." (citing *Leis v. Hustad,* 22 P.3d 885, 888 (Alaska

2001) ("[S]elf-serving testimony at trial is entitled to little weight because the parties' actions during the marriage are better indicators of the parties' intent during the marriage.") (citations omitted))).

**27.** AS 33.30.081(f).

**28.** *Hallam v. Alaska Airlines, Inc.,* 91 P.3d 279, 283 (Alaska 2004).

**29.** *Long v. Long,* 816 P.2d 145, 156 (Alaska 1991) (citation and internal quotations marks omitted).

**30.** *Id.* (quoting *Blake v. Gilbert,* 702 P.2d 631, 640 (Alaska 1985) (alteration in original)).

When a claim of bias only asserts an appearance of partiality, as distinguished from actual bias, we require the complaining party to make a "greater showing" for reversal.[31] In deciding whether an abuse of discretion occurred, we consider the totality of the relevant circumstances and facts.[32]

As we have already described in the statement of facts, a jury found Kelly guilty in his criminal case in March 2004. Judge Smith imposed his sentence on June 25, 2004. In the interim, in early June, the judge tried the property issues in the divorce case, and on June 17 issued his findings and conclusions resolving those issues. When Judge Smith spoke at Kelly's sentencing hearing, he emphasized the seriousness of Kelly's misconduct; to illustrate the point, the judge described his own strong reaction to viewing the images of child pornography that were introduced at the trial.[33]

Pointing to these remarks, Kelly asserts that Judge Smith's reaction was "so primal, and so visceral, that he could barely restrain himself." In Kelly's view, Judge Smith's remarks revealed intemperance and established that the judge had formed a bias against Kelly that must have influenced his judgment when he ruled against Kelly in the divorce proceedings. Alternatively, Kelly reasons, if the sentencing remarks fail to show actual bias, they at least create an impermissible appearance of bias.

 But Kelly specifically asked that Judge Smith be assigned to both of his cases. Moreover, opinions formed by a judge presiding over a trial do not reflect bias when they merely address relevant evidence admitted in the course of the trial.[34] Here, the views expressed by Judge Smith at the sentencing hearing described his reaction to photographs of child pornography admitted during Kelly's criminal trial. Judge Smith had been required to review, evaluate, and rule on the evidence in the course of the trial. The views Judge Smith expressed at the sentencing hearing were confined to the nature and character of the evidence itself and they served only to emphasize the important bearing that this evidence had on one of the primary issues the court needed to evaluate in imposing Kelly's sentence—the seriousness of his crimes.

Nothing in the judge's remarks evinced any inclination or intention to rely on his negative reaction to the child pornography except to the extent that this evidence had a legitimate bearing on the disposition of the criminal case then under consideration. And Judge Smith said nothing to suggest that he had formed any generalized bias against Kelly, or that his reaction to the child pornography might color his judgment of Kelly in any other context.

Of course, it is undeniably true that Judge Smith voiced a strong negative reaction to the child pornography. But such photographs are inherently powerful evidence: their potential to evoke a strong response from a judge or a juror in a criminal trial cannot reasonably be viewed as unforeseeable or surprising. And Kelly suggests no reason to think that the potential effects of this evidence might not have been apparent to him when he was originally charged with the crimes. In spite of this, Kelly expressly stated that he preferred to have Judge Smith preside over both of his pending cases.

More important, Kelly has never specified how any of the views Judge Smith expressed in the criminal case might have carried over and actually influenced the judge's decisions on the matters at stake in the divorce proceedings. Kelly merely suggests that Judge Smith's bias is evidenced by his rulings against Kelly in the divorce. But as we have already determined in reviewing the merits of the disputed rulings, all of Judge Smith's decisions were carefully explained, find

---

**31.** *Long,* 816 P.2d at 156 (quoting *Alaska Trams Corp. v. Alaska Elec. Light & Power,* 743 P.2d 350, 353 n. 7 (Alaska 1987)).

**32.** *Lacher v. Lacher,* 993 P.2d 413, 421 n. 21 (Alaska 1999) (quoting *Blake v. Gilbert,* 702 P.2d 631, 642 (Alaska 1985)).

**33.** *See supra* at 453.

**34.** Both *Lacher,* 993 P.2d at 420–21, and *R.J.M. v. State,* 946 P.2d 855, 869–70 (Alaska 1997), reject claims of bias based on a judge's participation in prior judicial proceedings involving the same party in which negative evidence might have been introduced.

strong support in the evidence, and are solidly grounded on applicable law. And in all other respects, Judge Smith appears to have scrupulously kept Kelly's two cases separated—both procedurally and substantively—so as to insulate the decisions in the divorce from any appearance of influence by developments in the criminal case.[35]

Finally, as Judge Hensley recognized in independently reviewing and affirming Judge Smith's refusal to recuse himself, Judge Smith's written decision denying Kelly's recusal motion thoroughly explained the judge's basis for refusing to remove himself from the case and persuasively refuted Kelly's accounting of actual and apparent bias.

Under these circumstances, Kelly's claim of bias appears to be "little more than an expression of [his] dissatisfaction with the superior court's rulings."[36] We thus conclude that the record reveals no actual or apparent bias by Judge Smith and no abuse of discretion in the court's orders denying Kelly's motions for recusal and to set aside the court's earlier order dividing the parties' marital property.

## IV. CONCLUSION

For these reasons, we AFFIRM the superior court's judgment.

---

**35.** For example, as previously noted, Judge Smith stayed the divorce proceedings pending trial on Kelly's criminal charges to ensure that the divorce proceedings would not pressure Kelly to waive his right against self-incrimination in the criminal case; and although the jury verdict against Kelly was virtually certain to result in a lengthy prison sentence for Kelly, Judge Smith expressly declined to consider this possibility as a factor in ruling on Kelly's request for spousal support because Kelly's sentencing hearing had not yet been held.

**36.** *Lacher,* 993 P.2d at 421.