*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| BERTHA DELORES HALL, | ) | |
| | ) | Supreme Court No. S-16083 |
| Appellant, | ) | |
| | ) | Superior Court No. 3PA-14-01357 CI |
| v. | ) | |
| | ) | O P I N I O N |
| ADOLPH HALL, | ) | |
| | ) | No. 7296 – September 14, 2018 |
| Appellee. | ) | |
| _____ | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Eric Smith, Judge.

Appearances: Lynda A. Limón, Limón Law Firm, Anchorage, for Appellant. David A. Golter, Golter Law Office, LLC, Palmer, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

STOWERS, Chief Justice.

## I.     INTRODUCTION

A couple divorced in 2015 and disputed whether certain pieces of real property in Louisiana and Mississippi were separate or marital. The superior court relied on provisions in a document titled a last will and testament for its finding that the parties intended that the Louisiana properties be the husband's separate property and that the Mississippi properties be the wife's separate property. We conclude that the court erred in its transmutation analysis. The court also erred in not providing support for its finding

regarding the ownership of one of the Louisiana properties and in not addressing the question of the purported conveyance of properties by the husband to his children before the parties' separation. We reverse the superior court's property distribution decision and remand for further proceedings.

## II.    FACTS AND PROCEEDINGS

Adolph and Bertha Hall[1] married in June 1975, separated in November 2014, and divorced in August 2015. No children were born of the marriage. Both Adolph and Bertha had been married previously and have children from their first marriages.

Before they married, Adolph owned 137 acres in Louisiana. He defaulted on that property when he and his first wife divorced. Adolph's father purchased the property to avoid foreclosure, with the understanding that Adolph would pay him back for it. Adolph's father executed a counterletter[2] in March 1973, documenting that the property was purchased on behalf of Adolph. At some point after the initial document was prepared, the following language was added to the counterletter: "$40,000.00 paid to John Hall by Adolph Hall May 1975, Adolph Hall being Divorced = and being a Single man." Someone initialed the change with the date May 15, 1975; Adolph did not know who initialed it and testified that the initials were neither his nor his father's. Adolph testified that he finished repaying the $40,000 in May 1975, shortly before his marriage to Bertha on June 9, 1975, but the superior court "did not find credible

---

[1]    Bertha's name has been restored to Bertha Rouser Scott.

[2]    A counterletter is "[a] document in which the parties to a simulated contract record their true intentions." *Counterletter*, BLACK'S LAW DICTIONARY (10th ed. 2014) (citing La. Civ. Code Ann. art. 2025 (2016)). "For example, the record owner of real property may acknowledge in a counterletter that another person actually owns the property." *Id.*

Adolph's testimony that he was able to pay his father $40,000 in a little under two years" and pointed out that "the provenance of the annotation on the Counter Letter is unclear." Instead, "[t]he court found credible Bertha's testimony that the parties made payments on the 137 acres during the marriage." The 137 acres were deeded to Adolph by his father in January 1983. The Louisiana Department of Transportation and Development later purchased a portion of that land, with both Adolph and Bertha signing the document of sale. Adolph also sold timber from the 137 acres and sometimes placed the sale proceeds into joint marital accounts. He conveyed the 137 acres to his children in January 2014, allegedly without Bertha's knowledge.

Other properties discussed during Adolph and Bertha's divorce proceedings include three smaller lots in Louisiana and some land in Mississippi. Adolph and Bertha dispute the ownership of one of the smaller Louisiana lots, lot 9, which was purchased during the marriage. According to Adolph, his son owned half of lot 9, having made monthly payments on it. He testified that the other half was marital and that he "felt like [Bertha] had an interest in the property" and therefore offered to pay her "[h]alf of what the appraiser's office has got it assessed for" when he conveyed the entire lot to his son in January 2014. According to Bertha, the payments from the son were not for the loan on lot 9 but rather for other loans between him and his father. She testified that she and Adolph still owned lot 9 and that she was not aware of the conveyance to Adolph's son until her attorney received that information from Adolph. As to the land in Mississippi, the superior court found that it was owned by Bertha prior to the marriage; according to Bertha's testimony, however, she received three acres as an inheritance, and she and Adolph later purchased additional property together in Mississippi.

In September 2007 Adolph and Bertha executed a document entitled "Last Will & Testament of Adolph Hall." The document was drafted without the aid of an attorney. Bertha testified that Adolph drafted the document and that she disagreed with

"the way he had it programmed" but eventually signed after making a change to one of the paragraphs.  Despite her reluctance to sign the document and her testimony that she had just had heart surgery, the superior court found "there was no evidence that she was compelled to sign the document or that she did not understand what she was signing." The document includes the following provision, signed by Adolph:  "I, **Adolph Hall** give up all rights to the Property in the State of Mississippi, which is in the name of Adolph & Bertha Hall."  The following provision in the document was signed by Bertha: "I, **Bertha Hall** give up all rights to the property in the State of Louisiana, with the exception of the cattle & Certificate of Deposit (CD), which is also in the state of Louisiana."

Adolph testified that the document "was done to confirm if anything did happen to [him], that the land in Louisiana would be conveyed to [his] children," and Bertha testified that it was for when Adolph died.  Both Adolph and Bertha testified that the agreement between them was that the property in Louisiana would be Adolph's and would be given to Adolph's children and that the property in Mississippi would be Bertha's, but the context suggests Bertha meant that this would be the arrangement *upon Adolph's death*.

In January 2014 Bertha talked with Adolph about getting a legal separation. Adolph testified that the conversation took place around Bertha's birthday, which he indicated is January 6 or 7.  On January 22 Adolph transferred the 137 acres to his children.  But he testified that the conversation about legal separation did not take place before he conveyed the property.  In March 2014 Bertha filed for divorce, and in November 2014 Adolph and Bertha separated.

Trial was held in May 2015 and the superior court issued a written order in August 2015.  The superior court granted the divorce and made determinations regarding property distribution.  The ownership of the 137 acres and lot 9 in Louisiana

was "substantially disputed." Adolph claimed that the Louisiana property was his separate property and Bertha claimed that it was marital. The court noted Bertha's arguments that both Adolph and Bertha signed the document of sale for the portion of that property that was sold to the State of Louisiana and that proceeds from timber sales from the 137 acres were placed into joint marital accounts, and it "found credible Bertha's testimony that the parties made payments on the 137 acres during the marriage." "These facts," the court found, "would support Bertha's claim that the 137 acres were transmuted into marital property." "But," the court explained, "there is more persuasive evidence that the parties did not intend to treat either the 137 acres or the Mississippi property as marital property." The court cited provisions from the "Last Will & Testament of Adolph Hall" document, concluding that they were "a fully credible indication of the parties' intent regarding the 137 acres and the Mississippi property" and "that even if both properties had been treated as marital property . . . , both parties clearly stated their intent that the properties henceforth were to be treated as their separate, non-marital property, to be given to their children." The court therefore found that the 137 acres were not marital property. The court also found that Adolph and his son owned lot 9.

Bertha appeals. She challenges the superior court's reliance on the "Last Will & Testament of Adolph Hall" document in determining that Adolph and Bertha intended for the 137 acres to be Adolph's separate property. She also challenges the finding that lot 9 was non-marital property owned by Adolph and his son.

III.    **STANDARD OF REVIEW**

This appeal concerns the first step for property division in divorce proceedings, "deciding what specific property is available for distribution," which often

requires characterizing property as separate or marital.[3] "Underlying factual findings as to the parties' intent, actions, and contributions to the marital estate are factual questions," which we review for clear error.[4] A finding of "inten[t] to transmute separate property into marital property is also reviewed for clear error."[5] The superior court's legal rulings are reviewed de novo.[6]

## IV. DISCUSSION

Under Alaska law a spouse's separate property may be transmuted into marital property if "that is the intent of the owner and there is an act or acts which demonstrate that intent."[7] As we explained in *Kessler v. Kessler*, separate property can transmute into marital property through an implied interspousal gift "when one spouse intends to donate separate property to the marital estate and engages in conduct demonstrating that intent."[8] We emphasized that the relevant intent is that of "the *owning spouse*, not the married couple."[9] And we explained that the inquiry was better framed "as an intent to 'donate' or 'convey' separate property to the marital unit or

---

[3]    *Beals v. Beals*, 303 P.3d 453, 458-59 (Alaska 2013).

[4]    *Id.* at 459.

[5]    *Hanson v. Hanson*, 125 P.3d 299, 304 (Alaska 2005).

[6]    *Turner v. Municipality of Anchorage*, 171 P.3d 180, 185 (Alaska 2007).

[7]    *Thomas v. Thomas*, 171 P.3d 98, 107 (Alaska 2007) (quoting *Chotiner v. Chotiner*, 829 P.2d 829, 832 (Alaska 1992)); *see also Sparks v. Sparks*, 233 P.3d 1091, 1094 (Alaska 2010), *overruled on other grounds by Engstrom v. Engstrom*, 350 P.3d 766, 771 (Alaska 2015).

[8]    411 P.3d 616, 618-19 (Alaska 2018).

[9]    *Id.* at 619 (emphasis in original).

marital estate, rather than as an intent to 'treat . . . separate property as marital property.' "[10]

The superior court's transmutation analysis was misdirected. The court's inquiry focused on whether the married couple intended to treat the property as marital property, rather than on whether the owning spouse intended to donate the property to the marital estate. The court found that marital funds were used to pay a mortgage on the 137 acres of Louisiana property titled in Adolph's name, that both Adolph and Bertha signed a document for the sale of a portion of that property, and that some income from that property was used by the marital estate. However, these facts are not key to transmutation's donative intent analysis.

The finding that marital funds were used for mortgage payments on the 137 acres suggests that some, if not all, of the 137 acres were marital property.[11] On remand the superior court should identify whether the 137 acres were marital property in whole or in part because it was paid for with marital funds; the court should then consider whether Adolph had the necessary donative intent with respect to any separate portion of the property. A similar analysis is needed regarding lot 9, which was purchased during the marriage.[12]

---

[10] *Id.* (first quoting *Sparks*, 233 P.3d at 1094; then quoting *Schmitz v. Schmitz*, 88 P.3d 1116, 1125 (Alaska 2004)) (footnote omitted).

[11] *Id.* at 622 & n.33 (noting that "in most equitable distribution states the use of marital funds to pay down the mortgage on separate property creates a marital interest in that property," without deciding whether to adopt that approach in Alaska (citing 1 BRETT R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY §§ 5:24, 5:26 (3d ed. 2005))).

[12] The superior court's decision appears to include no analysis to support the finding that the lot 9 "property was owned by Adolph and his son."

The superior court's analysis regarding the "Last Will & Testament of Adolph Hall" document was also unclear. The court described the document as providing "a fully credible indication of the parties' intent regarding the 137 acres and the Mississippi property" and found, based on that document, that Adolph and Bertha intended the 137 acres to be separate property. This could suggest that the court considered the document in the context of its transmutation analysis, as evidence that the 137 acres were not transmuted into marital property. But it appears that the court actually had moved on from its misdirected transmutation analysis without completing it and instead found that the document controlled the property disposition and enforced its terms.

Although the document was titled as a will, it had a number of deficiencies if intended to be a will. It could not be a valid joint will between Adolph and Bertha because only Adolph is identified as the testator; the document provides only that Adolph, not Bertha, declares it as his will; only Adolph signed as testator; and the witnesses identified only Adolph as the testator and stated that Adolph declared the document was his will.[13] And no customary will provisions are included for Bertha. Thus, the document was not Bertha's will.[14] And while Adolph appears to have honored will execution formalities, it does not appear that he actually included any testamentary property dispositions in the document.[15] It instead appears that he and Bertha attempted to create a present property agreement, so he would have separate property ultimately

---

[13]     *See* AS 13.12.502(a)(3) (requiring for witnessed wills two witness signatures of the testator's acknowledgments of or signature on will).

[14]     *See* AS 13.06.050(62).

[15]     *See* AS 13.12.602 ("A will may provide for the passage of all property the testator owns at death and all property acquired by the estate after the testator's death.").

passing to his children by intestate succession. Adolph testified at trial that the document "was done to confirm if anything did happen to [him], that the land in Louisiana would be conveyed to [his] children." The "will" contains no "gifts" to Adolph's children, so this would not happen as a gift under the will but rather by intestate succession as a result of the putative property agreement between Adolph and Bertha.[16] Furthermore, the superior court did not find that the document was a will and did not appear to treat it as a will; if the document were a valid will, the property disposition provision would likely have extinguished as a matter of law upon entry of the divorce.[17]

Instead, it appears that the superior court treated the document as something other than a will, potentially as a post-nuptial agreement in which the parties conveyed property interests to each other to place certain properties in sole and separate ownership. The court expressed its very clear view that the parties had agreed to a property arrangement "henceforth" controlling in their relationship. However, the court made no finding regarding the nature of the document and whether it was a post-nuptial agreement. If the document was a post-nuptial property division agreement, then its validity should be determined, taking into account the considerations in *Burgess v. Burgess*, which provides that "a transaction in which one spouse gains an advantage over the other is presumptively fraudulent."[18]

---

[16] *See* AS 13.12.101(a) ("A part of a decedent's estate not effectively disposed of by will passes by intestate succession . . . .").

[17] *See* AS 13.12.804(a)(1)(A) (providing for divorce revocation of revocable property dispositions between former spouses); *see also* AS 13.12.802(a) ("An individual who is divorced from the decedent . . . is not a surviving spouse . . . .").

[18] 710 P.2d 417, 421 (Alaska 1985); *see also* AS 13.12.213(b); *Gabaig v. Gabaig*, 717 P.2d 835, 841 (Alaska 1986). The presumption of fraud may be overcome if the spouse gaining the advantage shows "(a) payment of adequate consideration; (b)
(continued...)

Thus, we reverse and remand for the superior court to consider whether some or all of the 137 acres and lot 9 were marital property, to conduct a transmutation analysis consistent with our opinion in *Kessler*, to make a determination as to the nature and validity of the "Last Will & Testament of Adolph Hall" document, and to determine an equitable distribution of the marital estate. Furthermore, we note that because the court found that the properties were separate, it did not reach the question of the purported conveyance of properties by Adolph to his children before the parties separated. This issue and other questions of fraudulent conveyance may need to be resolved on remand, and it is for the superior court to address any such questions in the first instance.

## V.    CONCLUSION

The superior court's property distribution decision is REVERSED and the case is REMANDED for further proceedings.

---

[18](...continued)
full disclosure to the other spouse of his or her rights and the value of the property; and (c) that the spouse conferring the benefits has competent and independent advice." *Burgess*, 710 P.2d at 421.