*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| ORVILLE WESLEY JENKINS LAYTON, | ) ) ) | Supreme Court No. S-18056 |
| Appellant, | ) ) | Superior Court No. 3AN-19-107361 CI |
| v. | ) ) | O P I N I O N |
| MARY TABITHA O'DEA, f/k/a Mary Tabitha O'Dea-Layton, | ) ) ) | No. 7615 – August 12, 2022 |
| Appellee. | ) ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Herman G. Walker, Jr., Judge.

Appearances: Orville W. J. Layton, pro se, Anchorage, Appellant. David S. Houston, Houston & Houston, PC, Anchorage, for Appellee.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

BORGHESAN, Justice.

## I.    INTRODUCTION

A man appeals the superior court's order dividing property upon divorce. We reject his arguments that the superior court (1) improperly denied his motion to continue trial, (2) incorrectly allocated marital debt to him, (3) improperly authorized sale of the marital home before finalizing the property division, and (4) showed bias

against him. But we agree with his arguments that it was error to (1) decline to consider whether his wife's separate property was transmuted to marital property through contract and (2) find that no portion of earnings on the wife's separate investments was marital when the taxes on those earnings were paid with marital funds. We therefore reverse the judgment and remand for further proceedings.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Orville Wesley Jenkins Layton and Mary Tabitha O'Dea married in May 1981. They have one adult child. Layton retired in 2017 after a career as a federal government attorney. O'Dea has worked as a school secretary since 2003.

The parties separated in September 2019, when Layton moved out of their Eagle River home. O'Dea filed for divorce in October.

### B.    Proceedings

#### 1.    Pre-trial motions and hearings

O'Dea moved for interim relief in November 2019, requesting interim possession of the marital home, interim support, and interim attorney's fees. Layton, representing himself, filed a cross-motion for interim relief, requesting authorization to use funds from investment accounts containing an inheritance O'Dea had received from her mother. Following a January 2020 hearing, the superior court granted O'Dea interim possession of the home and interim support and denied Layton's cross-motion, reasoning that any claims pertaining to O'Dea's inheritance would be addressed in later proceedings.

At the January hearing, the court set a trial date in July. In May, approximately 10 weeks before trial, Layton moved for a 60-day continuance. He explained that the COVID-19 pandemic had made it difficult to secure legal

representation, and he needed more time to hire an attorney and allow that attorney to prepare for trial. The court denied Layton's motion without explanation.

Around that time, O'Dea moved for permission to put the marital home on the market. O'Dea alleged that the home had been privately appraised at $380,000 and that sale of the home would allow the parties to pay off their substantial debts, including a $322,803.90 mortgage. The court denied O'Dea's motion to sell the marital home, finding that there were no exceptional circumstances justifying the sale at that time.

### 2. Trial

The July divorce trial, held via videoconference, featured testimony from Layton and O'Dea and focused primarily on the parties' marital debts, the marital home, and O'Dea's inheritance.

#### a. Credit card and second mortgage debts

The parties incurred substantial debt during the marriage, including debt on several credit cards. O'Dea submitted evidence that the marital debt on their American Express credit card was $14,330.84 as of December 2019. She proposed in the property table attached to her trial brief that the full amount be allocated to Layton. There was undisputed evidence that the marital debt on three other credit cards totaled $8,729.27.

The parties also had a second mortgage with Loan Depot that according to Layton financed household expenses, repairs, and improvements during the marriage. The second mortgage had previously been addressed at a motion hearing. At that hearing O'Dea testified that the second mortgage debt totaled $17,500. Layton's trial brief asserted that as of July 2020, the debt totaled $16,832.22. In the property table O'Dea submitted with her trial brief, she proposed that the entire $16,832.22 debt be classified as marital and allocated to Layton. No evidence on the second mortgage debt was presented at trial.

### b. Marital home

O'Dea testified at trial that she still wished for the marital home to be sold, but that she would not object to Layton keeping the home if he were able to refinance it. She presented evidence on the value of the home: the private appraisal referenced in her pretrial motion to sell the marital home, and a municipal appraisal assessing the home's value at $431,800.

Toward the end of the trial, Layton suddenly dropped out of the virtual hearing.[1] The court and O'Dea attempted to contact Layton to no avail. In his absence, the court noted that Layton had not yet testified regarding his position on the fate of the marital home. The court asked O'Dea's attorney how he "want[ed] to treat that." O'Dea's attorney responded that O'Dea still wanted the home sold and that the court had authority to order a sale at that time. The court then stated that it wished "to get [Layton's] input" on the issue.

Layton rejoined the virtual trial soon afterward. The court asked Layton for his position on selling the marital home. Layton said he would agree to sell it "[i]f necessary," but "[didn't] think it[] [was] going to be a viable option given the economy" at that time.

### c. O'Dea's inheritance

O'Dea inherited several hundred thousand dollars from her mother during the marriage. She testified that after receiving the inheritance, she had her financial advisor deposit the funds into two investment accounts. She testified that she did not discuss setting up those accounts with Layton or involve him in any of her discussions

---

[1] Layton experienced various technical difficulties during the trial. For example, he claimed at the start that he was unable to see video of the courtroom. He attempted to fix that problem but was apparently unable to do so. Layton later claimed to have lost video of O'Dea during her testimony.

with her financial advisor. O'Dea also testified that she never added Layton to those accounts, that he never contributed money to the accounts, and that she never added marital funds to the accounts. Finally, O'Dea testified that she would take a trip every year to visit her financial advisor to review plans for the investment accounts.

O'Dea testified that she withdrew funds from the investment accounts to purchase a door and remodel the kitchen and bathroom. She testified that she and Layton did not discuss how she would pay for those expenses.

Layton's testimony regarding O'Dea's inheritance focused largely on the taxes paid on the investment earnings from the accounts. According to Layton, he paid all the taxes on those earnings until O'Dea eventually began assisting in "later years." Layton testified that the annual taxes he paid on the earnings ranged from $6,000-8,000.

### 3. Post-trial motions for sale of the marital home

In the month after trial O'Dea renewed her motion to permit the sale of the home and requested expedited consideration of that motion. She explained that since she had recently moved out of the home, neither she nor Layton was living there any longer and a sale would allow them to pay off their marital debts. O'Dea stated that their realtor had suggested a proposed listing price of $465,000.

The court granted O'Dea "full authority" to sell the home the day after she filed the motion without waiting for a response from Layton. Layton then moved for reconsideration, arguing that the marital home was not "in a condition to ensure it brings full market price." He proposed waiting until the spring of 2021 to sell the home and renting out the home until then, arguing that would allow time to fix up the property which would then "increas[e] the potential to receive full market value."

The court held a hearing on Layton's motion at which it reiterated its decision to authorize the sale of the marital home, explaining that the home "need[ed] to be sold now" and there was a "perfect selling opportunity." The court reasoned:

"Interest rates are down near zero. It makes no sense to wait until the spring to sell the house when [there is] a perfect selling opportunity now." The court added:

> It seems to benefit everybody to get that house sold now, get as much money as you can — if it's being put on the market by the real estate agent for more than what it's being assessed at, you've got a better opportunity to sell that house now than if you wait until the spring to make the repairs.

The court also stated that it did not want to "keep[] the [parties] financially entangled for the next six months" because they each "need[ed] closure." The court concluded, "[T]he sooner we get . . . marital debt paid off . . . it's just better for everybody."

Soon afterward, O'Dea agreed to sell the home to a buyer for $430,000 minus $10,500 in closing costs. Layton moved to suspend that sale, objecting to what he alleged were O'Dea's "unilateral efforts to sell the property." The court denied Layton's motion, reasoning that its order authorizing sale of the marital home was still in effect and that Layton had provided no evidence that the sale agreement was faulty or contrary to the interests of the marital estate. The court ordered Layton not to interfere with the pending sale and allowed O'Dea to seek attorney's fees incurred in addressing Layton's motion.

Layton filed a petition for review of the superior court's order allowing the sale of the marital home. We denied Layton's petition.

Because Layton was "not cooperat[ing] to facilitate the sale," the superior court directed the entry of a clerk's deed conveying Layton's interest in the marital home to O'Dea. The home was sold in December for $430,000 less $10,500 in closing costs. The sale resulted in proceeds of about $39,000 after paying off the mortgage and other expenses associated with the sale.

### 4. Superior court's findings of fact and conclusions of law

The superior court issued written findings of fact and conclusions of law in March 2021. The court initially declared that it was going to divide the marital estate 55/45. But the court then contradicted this statement, determining that a 50/50 split was equitable and proceeding to divide the property 50/50. The court ordered the parties to pay off the debt from two marital credit cards using the equity from the sale of the home and allocated the marital debt on the third credit card to O'Dea. It allocated the marital American Express credit card debt to Layton. The court did not address the second mortgage debt. The 50/50 split resulted in O'Dea owing Layton a $2,740 equalization payment. But after the court awarded O'Dea a credit of $6,956 for expenses she incurred post-separation and awarded her $1,000 in attorney's fees, Layton owed O'Dea $5,216. The court ordered that amount taken from Layton's share of the home sale proceeds.

The court ruled that O'Dea's investment accounts were her separate property. The court dismissed as inapplicable Layton's argument that the parties had entered into a contract to make the investment accounts marital property in exchange for making O'Dea's salary, which would otherwise be marital property, her separate property. Instead it considered only whether O'Dea had the intent to donate the investments to the marriage and found that she did not. It then found that there was no active appreciation in the investment accounts holding her inheritance,[2] reasoning that contributions Layton had made — including discussing investment plans with O'Dea and preparing and paying taxes on the profits from the accounts — were not causally connected to increases in the accounts' value.

---

[2] Active appreciation refers to an increase in value of a spouse's separate property during marriage caused by marital funds or marital efforts. *Aubert v. Wilson*, 483 P.3d 179, 188 (Alaska 2021). This appreciation may be treated as a marital asset. *Id.*

## C. Appeal

Layton appeals, challenging the following rulings: (1) the refusal to continue the trial to a later date; (2) the allocation of the American Express credit card debt to him; (3) the authorization to sell the marital home before the final property division; (4) the refusal to apply a contract analysis to determine whether O'Dea's inheritance had transmuted to marital property; and (5) the finding that there had been no active appreciation in O'Dea's investment accounts. In addition, Layton maintains that the superior court was biased against him.

## III. STANDARDS OF REVIEW

### A. Decision Whether To Grant A Continuance

"We 'will not disturb a [superior] court's refusal to grant a continuance unless an abuse of discretion is demonstrated.' "[3] "An abuse of discretion exists when a party has been deprived of a substantial right or seriously prejudiced by the [superior] court's ruling."[4] "We consider 'the particular facts and circumstances of each individual case to determine whether the denial was so unreasonable or so prejudicial as to amount to an abuse of discretion.' "[5]

### B. Division Of Marital Property

"Alaska follows the law of equitable distribution, which is a set of rules for dividing property upon divorce."[6] When dividing marital property in a divorce

---

[3]     *Greenway v. Heathcott*, 294 P.3d 1056, 1062 (Alaska 2013) (quoting *Azimi v. Johns*, 254 P.3d 1054, 1059 (Alaska 2011)).

[4]     *Id.* (quoting *Azimi*, 254 P.3d at 1059).

[5]     *Id.* (quoting *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 183 (Alaska 2009)).

[6]     *Aubert*, 483 P.3d at 186 (quoting *Kessler v. Kessler*, 411 P.3d 616, 618 (continued...)

proceeding, a superior court must: "(1) determin[e] what property is available for distribution, (2) find[] the value of the property, and (3) divid[e] the property equitably."[7] This appeal concerns the first and third steps of the superior court's property division.

We review the characterization of property as separate or marital for clear error with respect to any "[u]nderlying factual findings as to the parties' intent, actions, and contributions to the marital estate," and de novo with respect to "whether the [superior] court applied the correct legal rule."[8] The superior court's factual findings are clearly erroneous "only when we are left with a definite and firm conviction based on the entire record that a mistake has been made."[9]

"A [superior] court has broad discretion to provide for the equitable division of property between the parties in a divorce."[10] "We review the [superior] court's equitable distribution under an abuse of discretion standard, and will reverse only if the division is clearly unjust."[11]

---

[6] (...continued)
(Alaska 2018)).

[7] *Downs v. Downs*, 440 P.3d 294, 297 (Alaska 2019) (alterations in original) (quoting *Dunmore v. Dunmore*, 420 P.3d 1187, 1190 (Alaska 2018)).

[8] *Beals v. Beals*, 303 P.3d 453, 459 (Alaska 2013) (quoting *Hanson v. Hanson*, 125 P.3d 299, 304 (Alaska 2005)).

[9] *Aubert*, 483 P.3d at 186 (quoting *Pasley v. Pasley*, 442 P.3d 738, 744 (Alaska 2019)).

[10] *Ethelbah v. Walker*, 225 P.3d 1082, 1086 (Alaska 2009) (citing AS 25.24.160(a)(4)).

[11] *Id.*

## C.     Order For Pre-Judgment Sale Of Property

We review a superior court's order permitting the sale of property prior to the court's final property division for abuse of discretion.[12] "Under the abuse of discretion standard, we ask 'whether the reasons for the exercise of discretion are clearly untenable or unreasonable.' "[13]

## D.     Appearance Of Judicial Bias

"We review de novo the question of whether a judge appears biased, which is assessed under an objective standard."[14]

## IV.    DISCUSSION

### A.     It Was Not An Abuse Of Discretion To Deny Layton's Motion For A Continuance.

In May 2020 Layton moved for a continuance of the July 2020 trial date, citing a need for more time to hire an attorney and to allow that attorney to prepare for trial. The superior court summarily denied Layton's motion. Layton challenges the superior court's denial of his request for a continuance,[15] asserting that the record shows he demonstrated due diligence.[16]

---

[12]     *Watega v. Watega*, 143 P.3d 658, 663 (Alaska 2006).

[13]     *Hall v. Hall*, 446 P.3d 781, 783 (Alaska 2019) (quoting *Jensen D. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 424 P.3d 385, 387 (Alaska 2018)).

[14]     *Downs v. Downs*, 440 P.3d 294, 297 (Alaska 2019) (quoting *Mengisteab v. Oates*, 425 P.3d 80, 85 (Alaska 2018)).

[15]     Layton asserts that this decision is reviewed de novo. However, our precedent is clear that a denial of a request for a continuance is reviewed for abuse of discretion. *Greenway v. Heathcott*, 294 P.3d 1056, 1062 (Alaska 2013).

[16]     Layton also contends that the superior court should have treated him as a pro se litigant and advised him of the need to include an affidavit with his motion for a

(continued...)

"[A] party who seeks to continue a case for trial must show that he acted with due diligence upon the grounds for which continuance is sought."[17] "A continuance for the purpose of finding and obtaining counsel requires [this] showing of diligence."[18] "[P]rejudice resulting from a party's lack of diligence in securing an attorney does not afford a basis to obtain a continuance."[19]

Layton failed to make the requisite showing of diligence to support his motion for a continuance. He represented himself from the outset, explaining at the interim hearing in January 2020 that he lacked the money to hire an attorney.[20] Layton's subsequent motion for a continuance did not identify when he became able to afford an

---

[16]     (...continued)
continuance. *See* Alaska R. Civ. P. 40(e)(2) (requiring that motions for continuance "be supported by the affidavit of the applicant setting forth all reasons for the continuance"); *Leahy v. Conant*, 436 P.3d 1039, 1043 (Alaska 2019) ("We review for abuse of discretion 'decisions about guidance to a pro se litigant.' " (quoting *Greenway*, 294 P.3d at 1062)). We do not know whether the superior court denied the motion for lacking an affidavit, but even if that were the case, we reject the notion that Layton — a retired attorney with thirty years of experience — was entitled to the leniency typically given to self-represented litigants with respect to procedural requirements. *See Greenway*, 294 P.3d at 1071 (discussing that procedural leniency is afforded self-represented litigants when there is a "lack of familiarity with the rules" (quoting *Wright v. Shorten*, 964 P.2d 441, 444 (Alaska 1998))).

[17]     *Greenway*, 294 P.3d at 1067 (alteration in original) (quoting *Azimi v. Johns*, 254 P.3d 1054, 1061 (Alaska 2011)).

[18]     *Id.*

[19]     *Shooshanian v. Dire*, 237 P.3d 618, 624 (Alaska 2010) (quoting *Siggelkow v. Siggelkow*, 643 P.2d 985, 988 (Alaska 1982)).

[20]     Layton claimed in his motion for a continuance that he had informed the superior court at the interim hearing that he was "seeking to obtain [legal] services." However, the hearing transcript does not indicate that Layton ever mentioned that effort.

attorney or what he had done since then to procure one.[21]  He blamed the COVID-19 pandemic for his difficulty finding an attorney, but he failed to explain whether he had tried to contact any prospective counsel over the phone, over videoconference, or by mail.  Furthermore, Layton did not have any specific attorney in mind when he moved for a continuance, stating only that he "believe[d] he [would] be able to . . . interview and decide on an appropriate advocate for the trial."  In short, Layton did not show due diligence, particularly as this case had been going on for almost seven months before he requested a continuance.  Therefore, it was not an abuse of discretion to deny the continuance.

Layton also cites our March 2020 order pertaining to the COVID-19 pandemic, arguing that the superior court abused its discretion by failing to "liberally allow continuances."  But our order merely recommended that "[j]udges . . . liberally allow continuances of hearings and trials as necessary depending on the circumstances" due to the pandemic.[22]  That order did not limit the superior court's discretion to deny a motion for a continuance lacking a show of diligence.

### B.  It Was Not An Abuse Of Discretion To Allocate Marital Credit Card Debt To Layton.

Layton next takes issue with the superior court's allocation of the American Express credit card debt to him.  He appears to argue that the superior court treated the American Express credit card debt as his separate debt, and that doing so was error

---

[21]     *See Greenway*, 294 P.3d at 1069 ("In the abstract, given the general value of having trial counsel, we assume that courts would be reluctant to deny a *well-supported* motion for a continuance so an *identified lawyer* could represent the moving party at trial.  But that consideration would not render irrelevant other pertinent circumstances, such as party prejudice, undue delay of trial, or lack of diligence." (emphases added)).

[22]     Alaska Supreme Court Order No. 1957, at 3 (Mar. 13, 2020).

because the debt was incurred during the marriage. Yet it is clear that the superior court classified the American Express debt as marital. At trial the parties agreed that $14,330.84 of the American Express debt was marital, and the court's comments in its property division order as well as its property division spreadsheet indicate that the court allocated that full amount to Layton as marital debt.

With that point in mind, the superior court's allocation of the entire amount of that marital debt to Layton was well within its "broad discretion in fashioning property divisions."[23] After allocating various marital debts and assets to each party to achieve a 50/50 split, the court required O'Dea to make a $2,740 equalization payment to Layton. Allocating the substantial American Express debt to Layton may have helped him avoid the hardship of having to pay O'Dea an offset. If the superior court had allocated each party half of the American Express debt, for example, Layton would have had to make a $4,425 equalization payment to O'Dea, while still being responsible for over $7,000 of the debt. The record suggests that Layton lacked savings and may well have struggled to make such a payment. We therefore conclude that the court's allocation of the entire American Express credit card debt to Layton was not an abuse of discretion.

C.    The Superior Court Did Not Abuse Its Discretion By Authorizing Sale Of The Marital Home Before Dividing The Marital Estate.

Shortly after trial the superior court issued an order granting O'Dea's renewed motion to authorize the sale of the marital home. The order gave O'Dea "full authority to market, price, authorize repairs, and sell" the marital home and to "otherwise take any actions needed to liquidate the property."

---

[23]    *Beal v. Beal*, 88 P.3d 104, 110 (Alaska 2004) (quoting *Edelman v. Edelman*, 3 P.3d 348, 351 (Alaska 2000)); *see also Ethelbah v. Walker*, 225 P.3d 1082, 1086 (Alaska 2009) ("We review the [superior] court's equitable distribution under an abuse of discretion standard.").

Layton argues that the superior court abused its discretion by authorizing sale of the marital home prior to dividing the marital estate. He contends that the court failed to make factual findings demonstrating that exceptional circumstances justified the sale, and that "nothing in the record . . . substantiate[s] the [superior court's] reason[s] for ordering the sale." He urges us to invalidate the sale and rescind the clerk's deed conveying his interest in the residence to O'Dea.[24]

We have previously considered the sale of marital property prior to the final division of property in a divorce.[25] In *Watega v. Watega* we held that courts have the authority to allow pre-division sales of marital property,[26] though courts "do not have unlimited discretion" to do so.[27] We cited *Randazzo v. Randazzo*, in which the Supreme Court of New Jersey affirmed an order authorizing the pre-division sale of the parties' marital property.[28] The parties in *Randazzo* had "little money to meet the[ir] financial obligations," including the "continued expense of maintaining the [marital] property,"

---

[24]     O'Dea asserts, without citation to authority, that we should not consider this issue on appeal because we rejected Layton's petition for review prior to this appeal and no new facts or evidence have emerged since then. Our decision to deny a petition for interlocutory review expresses no decision on the merits and does not preclude consideration of the issue on appeal from final judgment. *Contento v. Alaska State Hous. Auth.*, 398 P.2d 1000, 1001 (Alaska 1965).

[25]     *Watega v. Watega*, 143 P.3d 658, 659 (Alaska 2006); *Husseini v. Husseini*, 230 P.3d 682, 683 (Alaska 2010).

[26]     143 P.3d at 660-62 (determining that this authority exists under AS 25.24.140(b)(6)).

[27]     *Id.* at 663 (citing *Randazzo v. Randazzo*, 875 A.2d 916, 924 (N.J. 2005)).

[28]     875 A.2d at 924-25.

which sold before the trial court issued the divorce judgment.[29] Emphasizing that "trial courts should have the discretion to order the distribution of proceeds [from a pre-division sale] when distribution is deemed fit, reasonable, and just," the appellate court held that the trial court "acted well within its discretionary powers to order the sale of the [marital] property" to abate the parties' "mounting marital obligations."[30]

Pre-division sales can give courts a more accurate picture of the parties' financial circumstances and facilitate a fair division of the marital estate, so long as the proceeds of the sale are held in escrow pending the final property division. Accordingly, although we noted in *Watega* that "courts should permit [pre-division] sales sparingly and only for pressing reasons,"[31] courts have discretion to allow these sales to preserve the marital estate.[32] Preventing waste of marital assets is a sufficient reason to authorize a pre-division sale, provided that (1) the superior court's findings adequately justify the sale, and (2) the sale actually preserves the marital estate.[33] In *Husseini v. Husseini* we concluded that the superior court's decision to authorize the pre-division sale of the

---

[29]    *Id.* at 924.

[30]    *Id.*

[31]    143 P.3d at 663; *see also Husseini v. Husseini*, 230 P.3d 682, 688 (Alaska 2010) (acknowledging *Watega* and noting that courts should only exercise discretion to authorize pre-division sales in "exceptional circumstances").

[32]    *See Husseini*, 230 P.3d at 688 (providing "the preservation of marital assets" as an example of a pressing reason to order a pre-division sale); 1 BRETT R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 3:9 (4th ed. Dec. 2021 update) ("The rule against early division of marital property does not prevent the court from entering orders during the pendency of the action to preserve the marital estate. Where a showing of necessity is made, the court has broad power to change the form in which marital property is held . . . ." (footnote omitted)).

[33]    *Watega*, 143 P.3d at 663-64.

marital home — which resulted in the objecting spouse's eviction from the home — was not supported by adequate findings.[34] And because the pre-division sale in *Watega* was only for the amount of the loan and thus "did nothing to increase or preserve the assets of the marital estate," we concluded there that the superior court abused its discretion by granting the husband's motion to authorize the sale.[35]

In this case, the benefits associated with the sale of the marital home — and the superior court's finding that it would be beneficial for the parties to quickly pay off their substantial marital debts — justified the order. The parties were paying the mortgage on the empty marital home and Layton, at least, was paying rent to live in his own apartment. Furthermore, Layton represented at a pretrial motion hearing that he was only making minimum payments on some of the parties' credit card debt, was "getting killed on interest rates," and wanted to "accelerate" his payments on the debt. The home sale allowed the parties to pay off the mortgage and still receive about $39,000 in proceeds. These proceeds were sufficient to allow the parties to extinguish some of their sizeable marital credit card debt and put Layton in a better position to pay down the remaining debt allocated to him in the final property division.

The superior court articulated a second reason supporting the pre-division sale of the marital home: the parties had "a better opportunity to sell [the] house" at that time rather than in the spring, as Layton had suggested, because O'Dea's real estate agent planned to list the home at a price over its assessed value. Although Layton

---

[34]   230 P.3d at 684, 688. A pre-division sale that would cause a spouse to be evicted should not be ordered lightly. When a pre-division sale would cause eviction, the reasons for pre-division sale — supported by sufficiently detailed factual findings — should be all the more pressing than required if no eviction will result. Here, however, neither Layton nor O'Dea was living in the marital home when the superior court authorized its sale.

[35]   *Watega*, 143 P.3d at 664.

alleged that waiting to sell the home would "increas[e] the potential to receive full market value," he provided no evidence that his proposal would result in a sale of greater net value. He did not represent that he had found a renter or that it would be easy to find one for a six-month period while repairs to the house could be made. Layton's argument that the springtime offered a better selling opportunity was similarly speculative and does not undercut the court's finding that there was a "perfect selling opportunity" when it issued the order. Nor does the fact that the home actually sold for $430,000, not $465,000, undermine the rationale for a prompt sale; though lower than O'Dea's representation of what the home could sell for, the amount of the sale is very close to the higher of the two appraised values presented at trial.

In sum, the superior court did not abuse its discretion by authorizing sale of the marital home.

**D. It Was Error To Classify The Investment Accounts As Separate Property Without Considering Whether There Was A Post-Nuptial Agreement To Make Them Marital Property.**

The superior court rejected Layton's trial argument that the parties had struck a bargain to make O'Dea's investment accounts marital property. Because the court believed the argument "ha[d] no merit," it made no factual findings about whether such an agreement existed and considered only whether O'Dea had intended to donate her inheritance to the marital estate.

Layton contends on appeal that the superior court erred by declining to consider the possibility that O'Dea's inheritance had transmuted to marital property by contract (as opposed to gift). We agree.

"Under Alaska law a spouse's separate property may be transmuted into marital property if 'that is the intent of the owner and there is an act or acts which

demonstrate that intent.' "[36] The classification of property can be changed not only by a gift,[37] but also "by an express or implied contract . . . or other transaction between the spouses during the marriage."[38] The nature of the transaction depends on the facts, so "the possibility of a contractual conveyance should be . . . considered" when analyzing an alleged change in the property's classification.[39]

Failing to engage in this inquiry was error because Layton's transmutation argument was based on an alleged agreement and there was some evidence to support the existence of that agreement.[40] Layton argued and testified at trial that he and O'Dea agreed to invest O'Dea's inheritance of approximately $366,000 and set it aside as a marital asset for major household expenses, joint vacations, and future retirement income. Layton insisted that in exchange, O'Dea's "entire annual salary," which would normally be marital property, would become her own separate property. Layton's self-

---

[36]   *Hall v. Hall*, 426 P.3d 1006, 1009 (Alaska 2018) (quoting *Thomas v. Thomas*, 171 P.3d 98, 107 (Alaska 2007)).

[37]   *Aubert v. Wilson*, 483 P.3d 179, 188 (Alaska 2021) (discussing that transmutation by implied interspousal gift "occurs when one spouse intends to donate separate property to the marital estate and engages in conduct demonstrating that intent" (quoting *Pasley v. Pasley*, 442 P.3d 738, 750 (Alaska 2019))).

[38]   1 TURNER, *supra* note 32, § 5:66; *see also Hall*, 426 P.3d at 1011 (remanding for superior court to determine whether spouses entered a post-nuptial property division agreement transmuting marital property into separate property).

[39]   1 TURNER, *supra* note 32, § 5:67.

[40]   *See James v. Alaska Frontier Constructors, Inc.*, 468 P.3d 711, 720 n.34 (Alaska 2020) ("The existence . . . of a contract is a question of fact." (quoting *Earthmovers of Fairbanks, Inc. v. Pac. Ins. Co.*, 614 P.2d 781, 782 (Alaska 1980))).

serving testimony alone "is not particularly probative" of the parties' intent.[41] However, O'Dea's testimony that large expenditures from the inheritance were made on various home improvement projects could indicate that the parties had contracted to transmute the inheritance into marital property.

Given the nature of Layton's claims, the superior court should have considered whether the evidence proved that the parties had entered into an agreement to treat O'Dea's inheritance as marital property.[42] We remand for the superior court to consider the evidence and make the pertinent findings.

---

[41] *See Hussein-Scott v. Scott*, 298 P.3d 179, 182 (Alaska 2013) ("[S]elf-serving testimony at the time of litigation about the parties' past intentions is not particularly probative [when interpreting a contract]."); *Pasley*, 442 P.3d at 747-48 ("Because a spouse's actual intent at the time of [a transaction] may conflict with the spouse's interests at the time of the divorce trial, 'the trial testimony of the parties must be viewed with careful skepticism.' " (footnote omitted) (quoting 1 BRETT R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 5:23, at 629 (3d ed. Nov. 2017 update))).

[42] The superior court's finding that O'Dea did not intend to donate her inheritance to the marital estate does not preclude finding an agreement for consideration. Although "donative intent is almost always demonstrated through some minimum amount of objective conduct," the ultimate question is whether the owning spouse had "actual subjective donative intent." 1 TURNER, *supra* note 32, § 5:69; *see also Thomas v. Thomas*, 171 P.3d 98, 107 (Alaska 2007) ("Separate property can become marital property where that is the intent of the owner and there is an act or acts which demonstrate that intent." (quoting *Chotiner v. Chotiner*, 829 P.2d 829, 832 (Alaska 1992))). In a contractual analysis, on the other hand, the ultimate question is whether the parties objectively manifested an intent to make the separate property marital, notwithstanding any "subjective contrary intentions." *See Kingik v. State, Dep't of Admin., Div. of Ret. & Benefits*, 239 P.3d 1243, 1251 (Alaska 2010) (quoting *Dutton v. State*, 970 P.2d 925, 928 (Alaska App. 1999)); *see also* 1 WILLISTON ON CONTRACTS § 3:4 (4th ed. May 2022 update).

**E.    The Finding That Using Marital Funds To Pay Taxes On The Investment Earnings Did Not Cause The Investments To Appreciate Is Clearly Erroneous.**

Although the superior court acknowledged that the investment accounts containing O'Dea's inheritance increased in value, it found that the increase in value was not a marital asset because "[t]here is no connection between [Layton's] actions," including his use of marital funds to pay taxes on the investment earnings, "and appreciation of [the] inheritance."

Like transmutation, active appreciation is a way in which a spouse's separate property can become marital.[43] "Active appreciation occurs when marital funds or marital efforts cause a spouse's separate property to increase in value during the marriage."[44]  "For this doctrine to apply, there must be (1) appreciation of separate property during marriage; (2) marital contributions to the property; and (3) a causal connection between the marital contributions and at least some part of the appreciation."[45] "The spouse seeking to classify the appreciation as active has the burden of proving the first two elements — an increase in value and marital contribution — while the burden of showing the absence of a causal link lies with the owning spouse."[46]

The parties agree that the value of the accounts increased during the marriage but dispute whether there were marital contributions and, if so, whether there was a causal connection between those contributions and the appreciation of the accounts.  We conclude that the superior court did not err by determining that using

---

[43]    *Harrower v. Harrower*, 71 P.3d 854, 857 (Alaska 2003).

[44]    *Aubert v. Wilson*, 483 P.3d 179, 188 (Alaska 2021) (quoting *Odom v. Odom*, 141 P.3d 324, 333 (Alaska 2006)).

[45]    *Id.* at 188-89 (quoting *Odom*, 141 P.3d at 334).

[46]    *Id.* at 189 (quoting *Hanson v. Hanson*, 125 P.3d 299, 304 (Alaska 2005)).

marital funds to pay taxes on investment earnings is a marital contribution.[47] But it was clear error to find "no connection" between Layton's payment of those taxes and appreciation of the accounts.[48]

### 1. The use of marital funds to pay taxes on investment earnings is a marital contribution.

Layton maintains that the superior court erred by failing to consider O'Dea's activities — including her annual trips to the East Coast, paid for with marital funds, to meet and discuss the accounts with her financial advisor — as marital contributions.[49] Although time and expense contributed to increasing the value of investments may be classified as marital,[50] de minimis contributions are not credited toward active appreciation.[51] O'Dea's infrequent trips to meet with her financial advisor

---

[47] Whether a given set of facts amounts to a marital contribution for purposes of active appreciation is a question of law that we review de novo. *See* 1 TURNER, *supra* note 32, § 5:56; *Beals v. Beals*, 303 P.3d 439, 459 (Alaska 2013).

[48] Layton argues that this finding is reviewed de novo. But causation is a "subsidiary finding[]" of fact required to find active appreciation in separate property. *Harrower*, 71 P.3d at 858 (quoting BRET R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY, § 5:22, at 236 (2d ed. 19974)). The correct standard of review is therefore clear error. *See Foster v. Pro. Guardian Servs. Corp.*, 258 P.3d 102, 106 (Alaska 2011) (reviewing factual findings for clear error).

[49] Layton also argues that the superior court should have considered O'Dea's stock transactions, which allegedly "reflect considerable involvement on [her] part," in its active appreciation analysis. But the record does not show that O'Dea was personally involved in buying and selling individual investments.

[50] *Hanson*, 125 P.3d at 304; *Aubert*, 483 P.3d at 188-89.

[51] *See Miles v. Miles*, 816 P.2d 129, 131-32 (Alaska 1991) (affirming finding that wife's efforts to maintain and manage husband's premarital properties were de minimis and did not contribute to active appreciation of properties).

were de minimis contributions; therefore the superior court did not err by declining to consider them.

But significant contributions of marital funds to pay taxes on investment earnings are a different story.[52] Layton testified at trial that the annual taxes attributable to the investment earnings ranged from $6,000-8,000. He testified that he initially paid all the taxes on the investment gains, presumably with marital funds,[53] before O'Dea eventually began assisting in "later years." The superior court did not err by determining that the payment of these taxes was a marital contribution.

**2.      It was clear error to find no causal connection between Layton's tax payments on the investment earnings and appreciation of the accounts.**

Although the superior court found that Layton made marital contributions to the accounts and that there had been appreciation, the court saw "no connection" between these contributions and the appreciation.

Layton disputes the court's finding that the tax payments did not cause any appreciation. O'Dea counters that Layton failed to present evidence at trial supporting

---

[52]      *See Hanson*, 125 P.3d at 305 ("[I]t is undisputed that [the husband's business] was his full-time job and that he worked seventy to ninety hours per week when [the business] had a contract . . . . [W]e conclude that [the husband] spent significant marital time working on [the business]."); *Abood v. Abood*, 119 P.3d 980, 989-90 (Alaska 2005) (holding that time husband spent during marriage working for sweeping company that he owned and operated as sole proprietorship, as well as funds used to purchase equipment for company, were marital contributions); *Harrower*, 71 P.3d at 859 ("[T]he record supports the [superior] court's express finding that James contributed significant marital effort to the Kennicott property.").

[53]      *See Schmitz v. Schmitz*, 88 P.3d 1116, 1124 (Alaska 2004) ("Assets acquired during marriage 'as compensation for marital services' — most commonly salaries earned by either spouse during marriage — are considered marital assets." (quoting BRETT R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 5.23, at 263 (2d ed. 1994)).

his claim that paying taxes contributed to the increase in value of the accounts. She adds that to the extent there was evidence of marital contributions, the court did not clearly err by relying on her testimony to rebut Layton's causation argument.

Because the court found that Layton made marital contributions to the accounts and that there had been appreciation, Layton was entitled to a presumption that his contributions caused the appreciation.[54] The burden then shifted to O'Dea to prove the "absence of a causal link."[55] But she did not do so, and the court's justification for finding no causal connection between Layton's actions and the appreciation of the accounts was clearly erroneous. The court cited O'Dea's testimony that her financial advisor handled the accounts for her, that she met with the financial advisor once a year to discuss the investment, and that Layton was not at any of those meetings. This testimony does not address whether Layton's payment of taxes on the investment gains from the accounts caused at least part of the appreciation. Common sense suggests it did: Because O'Dea did not have to withdraw a portion of the earnings to pay taxes, those earnings remained in the accounts, increasing their value. Some of the accounts' increase in value is therefore marital property.

We remand for further proceedings regarding (1) the amount of marital funds used to pay taxes on the investment earnings and (2) the amount of the accounts' growth caused by the payment of taxes on the earnings using marital funds.[56] "In making

---

[54]    *See Aubert*, 483 P.3d at 189 (once spouse seeking to classify appreciation as active proves there has been marital contribution and appreciation, "[t]he burden of showing the absence of a causal link [shifts to] the owning spouse").

[55]    *See id.*

[56]    If the superior court finds on remand that the investment funds were transmuted to marital property through interspousal agreement, then the question of
(continued...)

these findings, the superior court retains the discretion to take whatever evidence it deems appropriate."[57]

### F. The Superior Court Did Not Appear Biased Against Layton.

Finally, Layton argues that the superior court appeared to be biased and treated him unfairly throughout the divorce proceedings.[58] To support this argument, Layton points to a variety of the court's actions: (1) granting O'Dea's motion for interim relief while refusing to consider Layton's cross-motion for interim relief; (2) granting O'Dea's expedited motion to authorize the sale of the parties' home without waiting for Layton's response; (3) making allegedly biased comments against Layton and excluding him from a discussion about a potential trial date; (4) discussing Layton's position on the marital home with O'Dea's counsel while Layton was absent from the virtual trial; and (5) referring to Layton as "Oliver" rather than "Orville" in its written findings.[59]

---

[56] (...continued) active appreciation is beside the point. The court must address active appreciation only if it finds that no transmutation occurred.

[57] *Hanson*, 125 P.3d at 306.

[58] Layton makes this argument for the first time on appeal. We have previously assumed without deciding that a claim of judicial bias raised for the first time on appeal may be considered, *see Downs v. Downs*, 440 P.3d 294, 299 (Alaska 2019), and we make the same assumption here.

[59] Layton also contends that the superior court displayed bias by proceeding with the divorce trial in spite of a host of technical difficulties Layton had using the videoconferencing software, including an inability to see video of the courtroom, loss of video while O'Dea was testifying, and loss of connection while he was testifying. Layton waived this argument because he did not object to the court's moving forward with the trial on these grounds. *See, e.g.*, *Cent. Bering Sea Fishermen's Ass'n v. Anderson*, 54 P.3d 271, 280 n.22 (Alaska 2002) (holding that parties' failure to object at trial to allegedly prejudicial closing argument waived "their right to object on that
(continued...)

"We review de novo the question of whether a judge appears biased."[60]  To prevail on a claim of judicial bias, "a party must demonstrate that the court formed an unfavorable opinion of the party from extrajudicial information."[61]  "[B]ias cannot 'be inferred merely from adverse rulings.' "[62]  "But judicial bias may . . . arise during the course of judicial proceedings if 'a judicial officer hears, learns, or does something intrajudicially so prejudicial that further participation would be unfair.' "[63]

Applying this test, we conclude that although the superior court made some errors in the course of the proceedings, its actions did not indicate bias against Layton.

### 1. Bias cannot be inferred from the superior court's adverse rulings on motions.

Layton argues that the superior court treated him unequally by granting O'Dea's motion for interim relief while denying his cross-motion for interim relief. Layton does not challenge the court's award of interim support to O'Dea.  Instead he highlights the court's justification for denying his motion — that considering it would

---

**59**    (...continued)
ground" on appeal).  For example, Layton stated at the beginning of the trial that he could not see the court but did not object, even after the court said, that "[As] long as you can hear me, that's okay because I can . . . see you."  In addition, Layton stated midway through the trial that he lost video of O'Dea while she was testifying, but acknowledged that he could hear her and that the proceeding could "go ahead."  At no point did Layton ask the court to stop the trial due to these technical difficulties.

**60**    *Downs*, 440 P.3d at 297 (quoting *Mengisteab v. Oates*, 425 P.3d 80, 85 (Alaska 2018)).

**61**    *Id.* at 299.

**62**    *Id.* at 300 (quoting *Kinnan v. Sitka Counseling*, 349 P.3d 153, 160 (Alaska 2015)).

**63**    *Id.* (quoting *Brown v. State*, 414 P.3d 660, 661 n.3 (Alaska 2018) (Winfree, J., concurring in part and dissenting in part)).

have required a determination as to whether investment accounts were a marital asset —
and contrasts it with the court's award of interim support to O'Dea, which was
"apparently based on a [factual] finding that a . . . portion of [his] retirement income was
marital property."

This argument fails for two reasons. First, the court's order is simply an
adverse ruling and does not demonstrate bias against Layton.[64] Second, the court's
rulings were not truly inconsistent. Layton's cross-motion for interim relief requested
authorization to use funds from the investment accounts derived from O'Dea's
inheritance. The parties hotly contested whether these accounts were marital property.
In contrast, there was no dispute that at least a portion of Layton's retirement income was
marital property that could be drawn on for interim spousal support.[65] Particularly in
light of this discrepancy, it was well within the court's discretion to grant O'Dea's
request for interim relief while rejecting Layton's at this stage of the proceedings.[66]

Layton also argues that the superior court showed bias against him by
granting O'Dea's expedited motion to authorize the sale of the marital home without
waiting for Layton's response. Although granting the motion without waiting for a
response was error,[67] the court rectified its error by granting reconsideration and holding

---

[64] *See Downs*, 440 P.3d at 300 ("[B]ias cannot 'be inferred merely from adverse rulings.' " (quoting *Kinnan*, 349 P.3d at 160)).

[65] *See* AS 25.24.140(a) (allowing courts to award expenses, including spousal maintenance, to a spouse in the interim of a divorce "in appropriate circumstances").

[66] *See Johnson v. Johnson*, 836 P.2d 930, 933 (Alaska 1992) ("The determination of an award of interim spousal [support] . . . is committed to the sound discretion of the [superior] court.").

[67] *See* Alaska R. Civ. P. 77(g)(6)-(7) (requiring court, absent certain exceptions, to allow opposing party "a reasonable opportunity to respond" to a motion
(continued...)

a hearing so that the parties could present argument on the issue. The court then took their testimony into account when making its decision. Given the court's efforts to correct the error, this series of events does not show bias.

### 2. The superior court's ex parte communications with O'Dea's attorney do not show bias.

Layton next claims that the court engaged in an ex parte discussion with O'Dea's counsel about the fate of the marital home while he was absent from the virtual hearing due to the lost connection, in violation of the Code of Judicial Conduct.

When Layton dropped out of the hearing in the middle of his testimony, the court stated that it did not know whether he had intentionally or accidentally left, "but at this point, he is no longer participating in this . . . hearing." The court noted that Layton had not yet testified about his position regarding what should be done with the marital home. The court asked O'Dea's attorney how he "want[ed] to treat that." O'Dea's attorney responded that O'Dea still wanted the home sold, and that the court had authority to order a sale at that time. The court then stated:

> All right. That was one of the things the court wanted to ask Mr. Layton before we got off this, what his plan was for the house. He didn't take — give any testimony about it. I will make a decision on that. I would like to get his input on it. I think he objected but I don't think he objected in the long run that it should be sold.

---

[67]    (...continued)
for expedited consideration).

Although we agree with Layton that this was an ex parte discussion,[68] the discussion was not "intrajudicially so prejudicial [as to] be unfair."[69] Layton was already aware that O'Dea wished for the house to be sold: O'Dea testified to that effect during her direct examination and had previously moved for permission to put the home on the market. Moreover, the court gave Layton the opportunity to explain his position upon his return: As soon as Layton rejoined the hearing, the court asked him what his position was regarding what should be done with the marital home — specifically, whether he would agree to sell it. Layton responded that he would "[if] necessary," but that he "[didn't] think it[] [was] going to be a viable option given the economy" at that time.

The superior court's brief ex parte discussion with O'Dea's attorney does not show bias against Layton.

---

[68] *See Communication*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "ex parte communication" as "[a] communication between counsel or a party and the court when opposing counsel or party is not present"); *Patterson v. GEICO Gen. Ins. Co.*, 347 P.3d 562, 570 n.21 (Alaska 2015) (relying on definition of "ex parte communication" in Black's Law Dictionary when concluding that judge's statement to a party's attorney off the record but in the opposing party's presence was not an ex parte communication). Although Canon 3(B)(7) of the Alaska Code of Judicial Conduct generally prohibits a judge from "initiat[ing], permit[ting], or consider[ing] ex parte communications or other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding," the court's violation of the letter of the canon does not suggest that it was biased against Layton. We also note that if a party voluntarily or intentionally leaves an ongoing proceeding or does not appear for a noticed proceeding, the court's moving forward with the proceeding is not improper ex parte communication.

[69] *See Downs*, 440 P.3d at 300 (quoting *Brown v. State*, 414 P.3d 660, 661 n.3 (Alaska 2018) (Winfree, J., concurring in part and dissenting in part)).

### 3. The record does not demonstrate that the superior court made comments critical of Layton or excluded him from discussions.

Layton argues that the superior court showed bias against him during the interim hearing by "criticiz[ing] [him] for voluntarily leaving the marital home" and "criticiz[ing]" his choice to move into an apartment with an $1,800 monthly rent.[70] But our review of the transcript persuades us that the court's statements were simply "the result of opinions and attitudes formed in court by the evidence that the judge heard."[71] The transcript does not indicate that the court "criticized" Layton's choices; rather, it shows that the court was swayed by O'Dea's argument that Layton could have rented a cheaper apartment after moving out of the marital home in light of the parties' significant ongoing marital expenses.

Layton also appears to argue that the court excluded him from the discussion during the interim hearing about a potential date for trial, but the transcript does not show this. Although only the court and O'Dea's counsel engaged in that discussion, there is no evidence that Layton lacked an opportunity to participate or that the court prevented him from providing input.

### 4. Using the wrong name in a written decision did not show bias.

Layton argues that the superior court showed bias against him by failing to be "attentive to the facts of the case," in particular by calling him "Oliver" instead of

---

[70] Layton further argues that the court appeared biased in favor of O'Dea when it told Layton to try to work out a settlement with O'Dea's "very reasonable" attorney. But to show judicial bias "a party must demonstrate that the court formed an unfavorable opinion of the party from extrajudicial information." *Id.* at 299. A judge's statement that a party's attorney is "reasonable" does not show bias in favor of that party or against the other.

[71] *See id.* at 300 (quoting *Hanson v. Hanson*, 36 P.3d 1181, 1186 (Alaska 2001)).

"Orville" in its findings of fact and conclusions of law.[72]  Referring to Layton by the wrong name was certainly an unfortunate mistake, and it is understandable that this mistake could cause Layton to question whether the court had considered his arguments with sufficient care.  But it is ultimately a scrivener's error that did not prejudice Layton and, without more, does not reveal bias against him.[73]

G.     On Remand The Superior Court Must Clarify Its Property Division.

The court did not clearly explain its division of the marital estate.  At one point the court declared that it would divide the marital estate 55/45; later, however, the court stated that a 50/50 split "[wa]s equitable" and proceeded to divide the property 50/50.  These conflicting statements leave us uncertain as to how the court actually intended to divide the marital estate.

In addition, Layton points out that the court did not address the second mortgage debt in its property division even though the parties had agreed before trial that approximately $16,832 of that debt was marital.  It is the parties' responsibility to present evidence in support of their position,[74] and they did not do so for this debt.  Without this evidence, we cannot say the superior court clearly erred by failing to allocate this debt.  But because the nature of this debt appears undisputed, and because we remand for other

---

[72]     Layton also argues that the court "disregard[ed] . . . simple facts" by putting his nickname, Wes, in the case caption.  But O'Dea, not the court, was responsible for including Layton's nickname in the case caption when she filed the case.  If Layton wished for his name to appear differently, he could have moved to amend the caption at any point in the proceedings.

[73]     *See Downs*, 440 P.3d at 300 ("[J]udicial bias may . . . arise during the course of judicial proceedings if 'a judicial officer hears, learns, or does something intrajudicially so prejudicial that further participation would be unfair.' " (quoting *Brown*, 414 P.3d at 661 n.3 (Winfree, J., concurring in part and dissenting in part))).

[74]     *Hartland v. Hartland*, 777 P.2d 636, 640-41 (Alaska 1989).

reasons, we leave it to the superior court's discretion to allow the parties to present evidence on this debt.

Omitting the second mortgage debt from the property division effectively renders it Layton's separate debt, as he appears to be the sole party making payments on it. O'Dea asserts that the debt's absence in the court's final allocation column is "reflective of the court's 55/45 split" of the marital estate. But as mentioned above, we are not certain whether the court intended a 55/45 or a 50/50 split. And even if the court did intend a 55/45 split, allocating the second mortgage debt to Layton does not produce that result— it instead produces an outcome far harsher for Layton.[75]

We therefore remand to the superior court to address the ambiguity in its overall property division and to allocate the second mortgage debt in a manner consistent with that division.

## V.     CONCLUSION

We VACATE the superior court's judgment and REMAND for further proceedings consistent with this opinion.

---

[75]     The court valued the marital estate at $31,378, allocating $12,949 to Layton and $18,429 to O'Dea. The court then required O'Dea to make a $2,740 equalization payment to Layton, leaving each party with $15,689 in net assets. Leaving Layton responsible for the entire $16,832 second mortgage debt wipes out all of the assets allocated to him, leaving him with $1,143 in liabilities while O'Dea holds onto her $15,689.